### NORTHERN PAC. RY. CO. v. CUMMISKEY.

(Circuit Court of Appeals, Eighth Circuit. April 24, 1905.)

#### No. 2,067.

**1. RAILROADS—ACCIDENTS TO TRAINS—COLLISION—INJURIES TO SWITCHMAN— RULES—VIOLATION—CUSTOM.**

A custom in railroad yards, permitting the use of a main track by engines and inferior trains without waiting the lapse of five minutes after the due time of a first-class train, which was reported late, provided there was sufficient time for the completion of the work in hand before the arrival of the belated train at the time reported, as required by a rule of the company, did not justify action on information as to the delay of such first-class train, received nearly an hour before.

**2. SAME—APPLICATION.**

Where a portion of the main track of defendant's railroad between certain stations, for a maximum distance of 15 miles, was used for the transfer of trains from different parts of the yards of another railroad, and defendant had prepared a separate time-table, covering such track, on which it had printed a rule providing that when a train stops, or is delayed under circumstances in which it may be overtaken by another train, the flagman must go back immediately with danger signals a sufficient distance to insure full protection, such rule applied to the operation of a transfer train of another company, in charge of a switchman, operated over such portion of the track on the time of a passenger train, on it appearing that the transfer train was being delayed, and was not going to be able to clear the main track in time to prevent a collision with the approaching passenger.

**3. SAME—CONTRIBUTORY NEGLIGENCE.**

Rules of a railroad company required that an inferior train, failing to clear the main track in time to keep out of the way of a superior train, must be protected as provided in another rule, requiring that a flagman be sent back immediately with danger signals a sufficient distance to insure full protection. Plaintiff, a switch foreman, in charge of a transfer train of another company, started to use a portion of defendant's track on the time of defendant's first-class passenger train, and though he saw such train approaching more than a mile away, and might easily have alighted and signaled the passenger train, as required by the rule, he did nothing except attempt to signal the passenger train with a lantern in a dim twilight, even after he observed that his signal had not been seen or was not being observed, whereupon a collision occurred and plaintiff was injured. *Held*, that plaintiff was guilty of contributory negligence precluding recovery.

In Error to the Circuit Court of the United States for the District of Minnesota.

L. T. Chamberlain and Alfred H. Bright (C. W. Bunn, on the brief), for plaintiff in error.

F. D. Larrabee (Mathias Baldwin, on the brief), for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and AMIDON, District Judge.

HOOK, Circuit Judge. Cummiskey recovered a judgment against the Northern Pacific Railway Company for injuries sustained in a rear-end collision which occurred upon one of the tracks of that company at Minneapolis, Minn. He was the foreman of a switching crew in the service of the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, commonly called the "Soo" Company, and at the time of the accident was engaged in conducting the transfer of a train through the yards of the Northern Pacific. The railroad tracks of the Northern Pacific which have immediate relation to the case extend from Northtown Junction across the Mississippi river to Fifteenth avenue, a distance of between two and three miles. Between those two points is located what is known as the Northeast Minneapolis yard of the Northern Pacific, and through it run two main line tracks—one for north or west bound trains, and the other for south or east bound trains. Commencing at a point a short distance below Northtown Junction, the main line tracks, flanked on both sides by switches and sidings, run southward in a straight line for a distance of more than a mile, and then turn sharply to the west, and cross the Mississippi river at right angles to their former course. Within the bend of this curve and for a part of the distance along the straight line are a large number of switch tracks, covering a lateral space of between 150 and 200 feet. The "Soo" Company owned railroad yards at Shorham, eastward of the Northern Pacific tracks, and also yards on the west side of the river, and by arrangement with the Northern Pacific it secured the right to transfer its trains from one to the other over the tracks and through the yards of the latter company. On the morning of December 10, 1902, Cummiskey, as switch foreman, was in charge of one of these transfer trains of the "Soo" Company, consisting of an engine and 25 cars, and it was his purpose to take the same from Shorham across the river to the yards of his company there located. His course was over a track running from Shorham a half or three-quarters of a mile to a connection with the Northern Pacific tracks at a point called Atlantic Junction, which was eight-tenths of a mile below Northtown Junction, thence across two or more tracks of the Northern Pacific until he was upon the south-bound main line of that company, and thence southward and westward along that line and across the Mississippi river until he came to a switch about Fifteenth avenue, which would let him off into the yards of his own company.

On the morning of the accident he arrived at Shorham, where his duties commenced at 6 o'clock. He immediately sought to communicate with the train dispatcher of the Northern Pacific to learn the whereabouts of passenger trains No. 8 and No. 4, both of which were due to use the main line on which he expected to travel between half past 6 and 7 o'clock. He called up the public telephone exchange in Minneapolis, and asked for the number of the train dispatcher. The young woman who occupied the positon of night operator at the exchange asked him what he wished to know. He replied that he desired to ascertain how Northern

Pacific No. 8 and No. 4 were, and she told him that the former was on time, and that the latter was 10 or 15 minutes late. It appeared that some time before this the train dispatcher of the Northern Pacific, not desiring to be bothered by public inquiries as to these trains, was accustomed at some time between 5 and 7 o'clock in the morning to advise the telephone operator as to the time of the trains and then she would impart the information to inquirers; and Cummiskey said, and it was not denied, that previously the dispatcher had in substance told him to inquire of her. Passenger train No. 8 was due at Northtown Junction at 6:35 and at Atlantic Junction at 6:38; but with this train we have no further concern, because it passed shortly before Cummiskey arrived with his transfer train at Atlantic Junction, and had no connection with the accident. Train No. 4 was a first-class passenger train from Portland, Or., and was scheduled to arrive at Northtown Junction at 6:50 and at Atlantic Junction at 6:52 in the morning.

After receiving the information about 6 o'clock that No. 4 was 10 or 15 minutes late, Cummiskey then obtained his bills and list of cars, from which he ascertained the cars he was to take over, assisted in making up his train, and started for Atlantic Junction. He arrived there at 6:44 a. m. His front brakeman opened the switches, and let the train in on the south-bound main line. Cummiskey closed the switches as the train passed over. His train straightened out on the main line and was fairly under way about 6:50, the time at which No. 4 was due at Northtown Junction, eight-tenths of a mile northward, and two minutes before the time it was due at Atlantic Junction. There was convincing evidence that No. 4 was on time that morning, and had been on time at every station within 93 miles of Northtown Junction. The train dispatcher's sheet made up from telegraphic advices from stations along the line so showed. The conductor and the engineer of the train so testified. The engineer of Cummiskey's transfer train said that upon pulling away from the crossover switch at Atlantic Junction he saw the headlight of No. 4 behind him at Northtown Junction. A pedestrian, Schonebaum, who exchanged greetings with Cummiskey immediately after he had closed the last switch, had walked but from 50 to 75 feet when he saw the headlight at Northtown Junction. The evidence against this fact consists largely of calculations predicated upon the distance covered by Cummiskey's train, the approximate speed of its passage, the time when Cummiskey says he saw the approaching passenger train, and the time of the collision, and it should not prevail against the very clear and positive evidence to the contrary. The transfer train proceeded on its way southward with Cummiskey upon the rear car. He testified that when he had gone about 1,800 feet from Atlantic Junction he for the first time discovered the headlight of No. 4 at Northtown Junction, more than a mile away. Shortly afterwards, while standing upon the rear car of his train, he gave to the approaching train the slow signal with his white lantern, and thereafter the signal to stop. But the signals were not seen by the engineer, and near the middle of the curve, about two-thirds of

a mile from Atlantic Junction, a collision with the rear end of the transfer train occurred, throwing Cummiskey to the ground, and inflicting upon him the injuries complained of. It was then at least 40 minutes before sunrise. There was testimony on behalf of Cummiskey that it was break of day, and that there was sufficient natural light to enable one to see objects as large as a car within a distance of half a mile; also testimony to the contrary. The headlight of No. 4 was burning, also the headlight of the transfer engine, and the signal lights of the various switches and on the semaphores.

The engineer of the passenger train testified that on account of the dim and uncertain light and the curve he was unable to discover the transfer train until too late to prevent the collision. There was, however, a fair conflict in the evidence upon this subject, and also as to the rate of speed of his train, and, in view of the verdict of the jury, we must assume that the passenger train was running too rapidly through the yards, and that the engineer negligently failed to keep a proper lookout for obstructions.

We therefore turn to a consideration of the defense that Cummiskey was guilty of negligence directly contributing to his injury. It is contended by the railway company that by taking his train upon the main track at the time he did he violated one of the special rules governing the movement of trains over that part of the railroad; also that when he saw passenger train No. 4 rapidly following him he violated other rules of the company, one of which, numbered 299, imperatively required that he immediately leave his own train and go back as far as he could to flag the other; and that his failure to observe those rules resulted in the collision. The verdict of the jury and a fair conflict in the evidence make it unnecessary that we consider the alleged violation by him of other rules than those just referred to. The following excerpts from the rules, which were received in evidence, are sufficient for a consideration of those contentions of the company which challenge our attention:

### Special Rule.

Yard engines in yard limits will work on time of first-class trains after they are five minutes past due, and will work on time of all other trains until they arrive, but will relinquish track immediately upon arrival of such trains. Delayed first-class and all other trains will be under proper control in yard limits expecting to find yard engines using main tracks.

### General Rules.

60. The greatest care and watchfulness must be exercised to prevent injury or damage to persons or property; in case of doubt take the safe course and run no risk.

207. Those giving signals must locate themselves so as to be plainly seen, and make them so as to be plainly understood. * * * Employés whose duty may require them to give signals, must provide themselves with the proper appliances, keep them in good order and ready for use.

285. An inferior train must keep out of the way of a superior train.

290. A train failing to clear the main track by the time required by rule must be protected as provided in rule 299.

299 (a). When a train stops or is delayed under circumstances in which it may be overtaken by another train the flagman must go back immediately with danger signals a sufficient distance to insure full protection.

(f) Should the speed of a train be reduced or its rear endangered, making it necessary to check a following train before a flagman can get back, lighted red fusees shall be thrown on the track at intervals.

(g) Responsibility for protection of a train rests with conductor and engineer, and they must know that their brakemen, flagmen and the firemen are conversant with and fully understand the application of all rules relating to the protection of trains, and comply therewith.

The special rule above quoted prohibited Cummiskey from venturing upon the main line with his train until after No. 4 was five minutes past due; that is, until after 6:57. Evidence was introduced, however, tending to show that there was a custom in those yards permitting the use, by engines and inferior trains, of the main line without awaiting the lapse of five minutes after the due time of a first-class train which was reported late, provided there was sufficient time for the completion of the work before the arrival of the belated train at the time reported. But even such a custom would not jus⁺ify action upon information received so long before as to be in the very nature of things unreliable. Cummiskey was familiar with the rules. As foreman of the switching crew he was in charge of the transfer train with the authority of a conductor, and its movements were subject to his order. It was fully three-quarters of an hour before he went upon the main line that he received information from the telephone operator as to the time of No. 4, and it was then reported only 10 or 15 minutes late. He took no other precaution and made no other inquiry, although he said that sometimes theretofore he got his information as to the train from his own yardmaster, sometimes from the Northern Pacific train dispatcher, sometimes from the telephone operator, and sometimes he would wait at Atlantic Junction until it was more than five minutes overdue before taking the track. The duty was incumbent upon him to exercise "the greatest care and watchfulness to prevent injury or damage to persons or property," and in case of doubt "to take the safe course and run no risk." It was shown that even had No. 4 been 10 or 15 minutes late at 6 o'clock, when he received the report, it could easily have made up the time before it reached the yards, and he said that he knew of trains reported late that came in on time, and others that, though still belated, had come in earlier than reported. So it was that when his train entered on the main line he had no information upon which he was entitled to rely that No. 4 would not be immediately behind him, and he must have known that his course might result in most serious consequences, especially in the event of concurring negligence of the engineer of that train. He knew that if No. 4 was on time, or less than five minutes late, it had the right to the track, and its engineer had a right to assume that his way was not obstructed by other trains. He knew that if that train was on time or less than five minutes late he had no right to go upon the track, and when he went there he did not know whether it was late or not. His clear duty, in the absence of other information than that which he possessed, was to wait at Atlantic Junction until five minutes after the due time of No. 4 at that place, and, failing to

observe that duty, he was not in the exercise of ordinary care. Had he waited, that train would have passed and the collision would not have occurred.

The Circuit Court instructed the jury that rule No. 299, which required the sending back of a flagman, did not apply "to such a train as plaintiff was engaged on, and in that place"; but that had his train been any other than a transfer or switching train operated in the yards he would have been held to a compliance with the rule, and his failure in that respect "would have been negligence of itself." And although it was held that the rule was not applicable, the court further instructed the jury that if a man of ordinary care and prudence would, under the existing circumstances, have sent a flagman back, then Cummiskey should have done so, and if his neglect of that duty helped to cause the accident he could not recover. To the jury, therefore, was committed the determination of the question whether ordinary care required the doing of that which the company contends it required by a specific rule applicable to the case. If the rule applied, and it imposed upon Cummiskey the duty to send a flagman or to go back himself and flag the approaching passenger train, it was error to make the existence of that duty dependent upon the conception of either court or jury of the requirements of ordinary care. There was no contention that the rule was unreasonable or that Cummiskey was not fully cognizant of it.

Whether the instruction of the Circuit Court was right involves a consideration of the character of the track upon which Cummiskey was moving, whether his engine and 25 cars constituted a train within the meaning of the rule, and the conditions appearing to him under which he was called upon to act. The only part of rule 299 that need be fully recited in this connection is the provision:

"When a train stops or is delayed under circumstances in which it may be overtaken by another train, the flagman must go back immediately with danger signals a sufficient distance to insure full protection."

After the transfer train had crossed over the tracks at Atlantic Junction, and pulled out upon the south-bound track, the last switch being lined up behind it, it was then upon the main line of the Northern Pacific. Although the track was in frequent use for switching and the transfer of trains, its primary character was that of a main line, and it was as much so as any other section of the road of equal length between St. Paul and the coast. It was used by through trains, both passenger and freight; and its use for other purposes was in subordination thereto, and so declared in unmistakable terms in the rules promulgated by the company. In no proper sense could the track upon which the transfer train was moving be called a switch or side track. A separate timetable, complete in itself, covering the railroad tracks from Northtown Junction to the union stations at Minneapolis and St. Paul, the maximum distance being about 15 miles, had been previously issued and was in force at the time of the accident; and upon

this time-card the officials of the Northern Pacific had caused the rule in question, with others, to be printed for the government of those using the tracks in the movement of trains. The track upon which Cummiskey was moving with his transfer train was covered by this time-table, and no other part of the lines between North-town Junction and the union stations of Minneapolis and St. Paul was more truly a part of the main line. Whatever may be said as to a switch track, seldom if ever traversed by a through train, it must be admitted that if the rule was in force at all in the territory covered by the time-table it was in force upon the main line track upon which Cummiskey was moving. If effect is to be given to the intention of the railway officials whose province and duty it was to make such rules and to prescribe their sphere of operation, there can be no doubt as to the construction to be adopted. The printing of the rule upon a time-table relating to the locality and embracing the track in question clearly evidences their intention, and that the rule applied to the track was the undisputed testimony of the men who were respectively the division superintendent and assistant division superintendent at the time of the accident.

Nor is there more room for doubt or conjecture as to the applicability of rule 299 when we come to the consideration of the character of the train which Cummiskey had charge of. If under the rule it was the duty of the conductor of a regular freight train, delayed upon this main line, to send a flagman back to protect his rear from an approaching passenger train, what satisfactory reason can be suggested for holding that under similar conditions it was not likewise the duty of the conductor of a transfer train? Cummiskey's train consisted of an engine and 25 freight cars, and, being either stopped or delayed upon the main line, it was as much a menace or source of danger as if it had been a train of any other kind or character. He himself testified that if his transfer train had broken down or been derailed he would have sent a flagman or gone back himself far enough to give the approaching train a reasonable distance in which to stop. A practical interpretation of the meaning of the word "train" in the rule was made by the railway company by the discharge, a few months prior to the accident to Cummiskey, of an employé who failed to go back with a flag to protect some cars in charge of a switching crew on the north-bound main track near Atlantic Junction. The neglect was in the omission to comply with the very rule now being considered, and it resulted in a collision with a passenger train. The difference between the two cases seems to be that in one the train or cars were in charge of a switching crew upon the north-bound main track, and in the other the train was a transfer train upon the south-bound main track. Other portions of the general and special rules appearing upon the time-table confirm the conclusion that an interpretation that would exclude the engine and 25 cars in charge of Cummiskey from the meaning of the word "train" would not be in accord with either the letter or the spirit of the rule in which that term is employed. The course of the engine

and cars was for a mile and a half upon the main line of railroad, and, while it might be said that they composed an "irregular train," nevertheless they made a train the presence of which upon the track when stopped or delayed would give rise to a danger which it was the purpose of the rule to guard against. The reason of the rule applies to such a train, and the letter is broad enough to comprehend it. Johnson v. Southern Pacific Company, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. ——.

The facts in the case, either conceded or fully proved, also show that that part of rule 299 which required the sending back of a flagman was applicable to the conditions confronting Cummiskey and of which he was fully cognizant. After his train had crossed the tracks at Atlantic Junction, and had straightened out upon the south-bound main line, he said to Schonebaum, a witness: "Yes, we are a little late; if we do not get a move on these cars, No. 4 will catch us if she is no later than reported;" or, as that witness testified, "I will have to hurry and catch my train and watch out for No. 4." Aside from the overwhelming testimony that the passenger train, No. 4, was on time, and that its headlight was either then in view or appeared at Northtown Junction almost immediately thereafter, Cummiskey himself admitted that he discovered the approaching headlight when it was more than a mile away. The progress of the transfer train was retarded by frosted and slippery rails, by the lightness and inefficiency of the engine considering the load it had to pull, and by the inability of the engineer to get sand under the wheels. It was not making the speed it was expected to make, it was delayed while occupying the main line upon the regular time of the passenger train, and Cummiskey knew that the information, obtained by him nearly an hour before, that that train was late was either incorrect or that the time had been made up, for the train was in sight and was rapidly approaching him. While standing upon the last car of his train he gave the slow signal with his white lantern, and he thought that it was answered by the shutting off of the steam, but immediately afterwards he discovered, as he said, that the train was coming on more rapidly than before. It was apparent to him that his signal had not been seen, or at least that it was not being observed. His own train was moving along slowly, about eight miles an hour, or, as one witness testified, about twice as fast as an ordinary man could walk. He said that at that rate of speed he could easily have descended to the track; but instead of doing so he stood near the rear end of the last car, and waved to an fro, in such light as existed about 40 minutes before sunrise, the lantern which he had in his hand. After he discovered that the passenger train had not obeyed his signal, but was rapidly approaching him, sufficient time remained for him to have descended to the track and gone back, as was required by the rule. His failure to do so resulted in his injury. We can perceive no escape from the conclusion that the rule which the court excluded, or rather the portion of it to which attention has been directed, applied to the place, the train, and the occasion.

How others construed the rule is shown by the action of the conductor of the passenger train, who immediately after the collision sent a flagman back, and went forward himself to flag trains from the south.

But even if it should not be declared that Cummiskey's train was "delayed" within the meaning of rule 299, there is another consideration which leads to the same result. Rules 285 and 290 read together required, "An inferior train failing to clear the main track in time to keep out of the way of a superior train must be protected as provided in rule 299," and Cummiskey neglected to so protect it. Rule 299 contains various requirements for the protection of trains, but it does not follow that, because some of them are not applicable to a particular emergency, none of them are.

It was contended that the rule requiring the sending back of a flagman had been abrogated by a custom prevailing in the yards to signal from the rear end of the train, but, as the jury were instructed that the rule was not applicable to the case, the evidence touching the alleged custom was not passed upon.

The judgment is reversed, and the cause remanded for a new trial.