## VEIT v. ANN ARBOR RAILROAD CO.

MASTER AND SERVANT—RAILROADS—PERSONAL INJURIES—FELLOW-
SERVANTS — NEGLIGENCE OF TRAIN DISPATCHER — OBSERVANCE
OF RULES.

In an action by a locomotive engineer against his employer, a
railroad company, for injuries sustained in a collision be-
tween his train and another, based on the concurring negli-
gence of the train dispatcher and the operatives of the other
train, evidence examined, and *held*, that the dispatcher was
not negligent, since he gave no orders affecting his right to
rely upon a proper observance by the trainmen of the rules of
the company governing the movement of trains, which ob-
servance would have prevented the accident.

Error to Gratiot; Searl, J. Submitted October 22,
1907. (Docket No. 115.) Decided December 10, 1907.

Case by Albert C. Veit against the Ann Arbor Rail-
road Company for personal injuries. There was judg-
ment for plaintiff, and defendant brings error. Reversed.

*T. W. Whitney* (*Ben. S. Warren* and *Alexander L.
Smith*, of counsel), for appellant.

*John T. Mathews* and *George P. Stone*, for appellee.

BLAIR, J. Plaintiff, engineer of defendant's train No.
7, brings this action to recover damages for injuries re-
ceived near Mesick in a head-end collision with the de-
tached engine of freight train No. 42. Mesick is a day
and night telegraph station on defendant's northern di-
vision. North of Mesick about three miles is Bagnall,
which is a flag station. Between Mesick and Bagnall,
and about two miles north of Mesick, there was a siding
known as "Claggett's Siding."

On the 18th day of March, 1905, an extra freight train,
known as 42, was running south, and at Bagnall

Siding nine cars and the tank of the engine left the track, and the wrecked cars covered the siding and the main line. This wreck occurred at about 6 o'clock a. m. The train crew succeeded in getting the engine back on the track, and they ran south to Mesick and reported fully what had occurred and the situation of the wrecked cars, so that the train dispatcher knew that the siding at Bagnall was completely obstructed and the main line blocked. Upon receiving this report, the train dispatcher sent the following train order No. 6 to No. 42:

"Work extra 42 will work 7:55 a. m. until noon between Mesick and Bagnall with right over freight trains. Freight and extra trains will protect against extra 42."

This order was repeated and made complete at 8:05 a. m. and delivered to Conductor Coe, who was the conductor of No. 42. After receiving the order, Coe left his head brakeman, Moody, at Mesick to notify No. 7 of the wreck at Bagnall and he and his engineer, Criss, took some men upon the engine and returned to the wreck. A little later, the engineer again ran the engine back to Mesick and to a tool house south of the depot, procured some tools and again returned to the wreck at Bagnall.

At about 8 a. m. on this morning in question, the plaintiff, who was engineer of No. 7, which was a regular passenger train, left Cadillac on its regular run north to Frankfort. The balance of the train crew were Jepson, conductor, and Doyle, fireman. At the stations between Cadillac and Mesick, section men had been collected by order of defendant's superintendent and these men were ordered to take No. 7 and go to the wreck to help in the work of clearing the track, and they went on board of No. 7, as ordered. At about 8:54, schedule time, No. 7 arrived at Mesick, and as plaintiff ran in he found the board out. After plaintiff had made his usual station stop at Mesick, brakeman Moody came onto his engine, and, addressing him as "Al.," said, "42 has had a wreck at Bagnall and the tank and nine cars are off the track." Plaintiff did

not know the man and he carried no flag and wore no uniform or anything to indicate that he was in the employ of the railroad company. This person made no further remark or explanation, and plaintiff alighted from his engine and went to a water-closet; after being gone a few minutes he returned to his engine, and, after getting some tools from it, went to work upon it and remained by it constantly until he pulled out as hereinafter stated. As soon as No. 7 arrived at Mesick, conductor Jepson was handed the following order or dispatch from the train dispatcher:

"DURAND, 3–18–'05.
"No. 7 report at Mesick for instructions.
"J. S. M."

After No. 7 had been waiting at Mesick about one hour, the train dispatcher sent and delivered to conductor Jepson this order:

"Jepson: Leave Mesick in time to transfer at Bagnall with No. 4.
"J. S. M."

During all this time the order board remained out. At some time during this interval, while in the depot, Moody told Jepson there had been a wreck at Bagnall, and told him he was sent back for the purpose of flagging for the wreck at Bagnall.

A short time after Jepson received the order to leave Mesick in time to transfer with No. 4 at Bagnall, the train dispatcher, who had been and was talking over the wire with the agent at Mesick about the wreck, asked the agent what was holding No. 7, and the agent said to Jepson: " J. S. M. wants to know why No. 7 don't go and get the section men over there that are on the train," and Jepson replied that he had an order to await instructions and he had not cleared from that, and the agent wired the train dispatcher that Jepson said he was waiting for further instructions and that the board was out. As soon as Jepson made this reply, the agent worked his tel-

egraph instrument for a few minutes, and then handed Jepson a clearance card from the order board, and at the same time he was handed the order No. 14, being, in substance, an order to run 2 hours and 50 minutes late Bagnall to Frankfort, and indicating a transfer at Bagnall with No. 4.

Upon receiving this clearance card and order, Jepson gave the plaintiff copies and went aboard his train and pulled the signal in the engine cab to go ahead. Just as the train was starting, Jepson saw Moody and he called to him from the coach platform to go with him.

At the time he started north from Mesick with his train, plaintiff had no knowledge or information whatever that No. 42 was on the track, but thought it was off the track at Bagnall and unable to move, and thought he had a clear track from Mesick to the wreck, and had no reason to believe anything to the contrary. When Jepson gave the engineer the signal to go forward on the order, he, Jepson, thought he had a clear track to the wreck, and did not know that No. 42 was working on the track between Bagnall and Mesick. No. 4 was a passenger train south bound from Frankfort to Cadillac, and was due at Bagnall at 11:33 a. m. It was about 10:30 that No. 7 left Mesick. The morning was foggy. As No. 7 was running down grade at ten or twelve miles per hour, and while on a curve about three-quarters of a mile north of Mesick, it met No. 42 returning to Mesick, and a head-on collision resulted, completely demolishing both engines, killing the firemen on both engines and seriously and permanently injuring the plaintiff. The brakeman Moody testified, as did the conductor and engineer of No. 42, that he was instructed to flag No. 7 and hold the train at Mesick until the engine of No. 42 returned to Mesick.

Certain rules of the defendant company were put in evidence, providing, so far as pertinent to the issues involved, as follows:

"RULE 86. An inferior train must keep out of the way of a superior train.

"RULE 87. A train failing to clear the main track by the time required by rule, must be protected, as provided in rule 99.

"RULE 89. At meeting points between trains of different classes the inferior train must take the siding and clear the superior train at least five minutes, and, must pull into the siding when practicable. If necessary to back in, the train must first be protected as per rule 99, unless otherwise provided.

"An inferior train must keep at least five minutes off the time of a superior train in the same direction.

"RULE 99. When a train stops or is delayed, under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. When recalled, he may return to his train, first placing two torpedoes on the rail when the conditions require it. The front of the train must be protected in the same way, when necessary, by the brakeman or fireman.

"FORM H. Work extra. (1) Work extra * * * will work * * * until * * * between * * * and * * *

"Examples: (1) Work extra 292 will work 7 a. m. until 6 p. m. between Berne and Turin.

"The working limits should be as short as practicable, to be changed as the progress of the work may require.

"The above may be combined thus: etc.

"When it is desired that a work extra shall at all times protect itself while on working limits, it may be done by adding to (1) the following words: (9d) protecting itself."

The court submitted the case to the jury upon the theory that the facts disclosed by the testimony presented an issue of fact as to the negligence of the train dispatcher, which might, alone or in concurrence with the negligence of fellow-servants, have occasioned the plaintiff's injuries. Defendant appeals, assigning as errors, that the court erred in refusing to direct a verdict for defendant, and in the charge to the jury.

It is conceded by counsel for plaintiff, and was held by the trial court, that, unless the facts proved warranted an inference of negligence on the part of the train dispatcher,

defendant was entitled to an instructed verdict. At the conclusion of plaintiff's brief it is said :

"We are not contending that the general rules of the defendant do not provide as much safety to the lives of its employés as any general and uniform code of rules may provide. However, we contend that no general rules can anticipate every situation or meet every emergency. And when such a situation or emergency arises and it is known to the defendant that there is, or likely to be, some doubt or uncertainty arising from the peculiar circumstances of the case, then and in such case we claim that the law imposes upon the defendant the same duty which the defendant imposes by its rule 106 upon its trainmen, viz. : 'In all cases of doubt or uncertainty, the safe course must be taken and no risks run.' And when the defendant ascertained that No. 7 was not held at Mesick by a flag, and knew the condition and situation of the wreck and the sidings, and that No. 7 was 1 hour and 19 minutes off its time, and knew the usual custom and usage would be to hold No. 7 until it became necessary for it to be at Bagnall to transfer with No. 4, then the defendant knew, and is properly charged with full notice of the fact, that there was a case of doubt and uncertainty as to whether No. 42 would be in the clear at 10 :30 a. m., and the safe course was obviously to either hold No. 7 until 11 :25 or give it notice of the work order that had been given to No. 42, and thereby run no risks, or at least reduce the risk to the minimum consistent with the public service required of it."

The trainmen of No. 42 had the same understanding of their duty, under defendant's rules, to protect themselves against No. 7 as plaintiff showed by his testimony that he had, and, to some extent at least, endeavored to discharge this duty, which, if fully discharged, would have entirely prevented the accident. The court instructed the jury, among other things, as follows :

"So under this rule you must inquire and determine whether Coe and Moody and Jepson each performed their duties properly or not. It was the duty of Coe to send out a flagman to stop No. 7 from coming on north to such a point as would endanger that train, and endanger either train, for that matter, and to give that flagman instructions to inform

the engineer and conductor, or one of them at least, of No.
7, of the fact that No. 42 was working in there, and if Coe
did not do that, he was negligent, and the plaintiff cannot
recover, unless you find this to be a concurring negli-
gence as explained to you hereafter.    It was the duty of
Moody to follow these instructions.    If he did not explain
to Veit any more than Veit says he did, but failed to tell
him that No. 42 was working from Mesick to Bagnall, or
failed to tell Veit not to go on, then this would be the
negligence of a fellow-servant, and if it was not negli-
gence which concurred with some negligence of the train
dispatcher, who, you will remember, is the company in
this case, it would bar recovery on the part of the plaintiff.
*    *    *

" The defendant, by its train dispatcher, having knowl-
edge of the wreck and having sent a work train to work
between Mesick and Bagnall from 7:55 a. m. till noon,
and knowing that No. 7, a passenger train, was due at
Mesick at 8:54 a. m. going north, and that No. 4 was due
at Bagnall at 11:35 a. m. going south, I charge you that
it became and was the duty of defendant, by its train
dispatcher, to act with reasonable care and prudence un-
der all the facts and circumstances within its knowedge
to safeguard the life of plaintiff and preserve him from
injury.

" If you find that defendant failed to perform his duty,
that would be negligence—I mean its duty in that regard,
and if you find that such negligence, either alone or concur-
ring with the negligence of plaintiff's fellow-servants or
some one or more of them, caused the collision, then your
verdict would be for the plaintiff, providing that the plain-
tiff was not guilty of contributory negligence himself.

" Now, in determining whether the defendant used such
care or not as I have spoken of, you will take into consid-
eration all that was done by the train dispatcher that
morning, the sending of the order holding up No. 7 at
Mesick for further (orders) instructions, together with
the order or message, whichever it was, to go to Bagnall
in time to transfer with No. 4, and the order to run 2
hours and 50 minutes late, and also the talk over the wire
between Jepson and the dispatcher through the agent at
Mesick and the instructions given Jepson at that time, and
determine from all these facts and all the other facts and
circumstances in the case as shown by the evidence,
whether the defendant was negligent in not giving notice

to the plaintiff or the conductor of No. 7 in some manner of the fact that No. 42 was working between Mesick and Bagnall, or in not finding out whether they had received such notice from the flagman sent out by No. 42, before permitting them to leave Mesick to go to Bagnall to make the transfer. If you find that it performed its duty in this regard, when it gave the order to No. 42, and that it had the right to rely upon the fact that the flagman of No. 42 would protect No. 7 from danger, notwithstanding what took place after these orders to No. 42 were given, and that it was not negligence on its part not to take any further precautions, then you will find for the defendant; but if you find that it should have used more care than it did use, and should have taken some further precautions, which, if taken, would have prevented the collision, then that would be negligence which makes the defendant liable. * * *

"I also instruct you that you cannot find the company liable simply because a copy of the work order was not delivered to train No. 7, that is, the trainmen, conductor and engineer on train No. 7. The rules of the company did not require this work order to be delivered to the crew of this passenger train. Mr. Veit knew the rules of the company before this accident happened; having knowledge of the rules of the company and that they did not require such dispatches or orders as this work order No. 6 to be delivered to a train crew of a passenger train, he cannot come in here and base negligence upon the failure of the company to deliver this order to his passenger train. That is what is known in law as an assumed risk, having knowledge that it was the custom of the company not to deliver these orders to the passenger crew, and having kept to work with that knowledge, he assumed that risk and he cannot complain because that order was not—a copy of that order was not delivered to his crew when they reached Mesick in the first instance. So that alone would not be sufficient to base a verdict upon of negligence."

So far as the negligence of the train dispatcher is concerned, the facts are undisputed, and the question presented for our determination is, whether inferences may properly be deduced from those facts of some duty on his part towards the plaintiff which he failed to discharge.

As the court properly instructed the jury, "it was the

duty of Coe to send out a flagman to stop No. 7 from coming on north to such a point as would endanger that train, and endanger either train, for that matter, and to give that flagman instructions to inform the engineer," etc. The trainmen of both trains understood this duty just as the train dispatcher understood it. No act or order of the train dispatcher changed this duty. The order No. 6 gave the crew of No. 42 the right to work, regardless of freight and extra trains but subject to train No. 7, against which train it was their duty to protect themselves. The train dispatcher was not chargeable with notice that if the crew of No. 42 returned to Mesick, as he expected they might, they would disregard the well understood rules made largely for the protection of their own lives. He had a right to rely upon the observance of the rules by the trainmen and to give his orders upon that basis. There is no evidence in this case to affect the right of the dispatcher to rely upon an observance of the rules, without which reliance he could not conduct the train movements of the road.

Judgment reversed, and new trial granted.

GRANT, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.