FERNETTE *v.* PERE MARQUETTE RAILROAD CO.

1. CONSTITUTIONAL LAW—MASTER AND SERVANT—STATUTES—FEL-LOW-SERVANTS—LIABILITY OF RAILROAD FOR NEGLIGENCE.

Act No. 104, Pub. Acts 1909 (2 How. Stat. [2d Ed.] §§ 4110-4116), abolishing the fellow-servant rule as to common carrier railroads, is constitutional. *Sonsmith* v. *Railroad Co.*, 173 Mich. 57 (138 N. W. 347).

2. RAILROADS—STATIONS—SIGNAL TOWER.

Within the meaning of a rule of defendant railroad company requiring a train stopping between stations to send back a flagman with signals, and of rules providing that extra or delayed freight trains must approach side tracks, water tanks, and fuel stations with train under control, and that inside yard limits at stations where yard-limit posts are erected and between switches at other stations, signals need not be sent out except under special circumstances, a place known as "Hoyt" designated as a station on defendant's time card, at which point a tele-

graph operator was maintained and trains were required to register, situated near the crossing of two roads, near a target and to which running orders were issued from other points, was a station, so that the engineer of a train governed by the rules was required to have his train under control and to take precautions to avoid a collision in approaching the station.

3. SAME.

And the rules must be so construed as to include within the term "station" so much of the track as trains would commonly be compelled to occupy if the crossing signal was set against them.

4. SAME—YARD LIMITS.

*Held*, also, that defendant's train, on the occasion of the collision in question, was within the "yard limits."

5. SAME—EVIDENCE.

It is the duty of the court, so far as possible, to construe and apply published rules of a railway corporation.

6. SAME—CONTRIBUTORY NEGLIGENCE—VIOLATION OF RULES.

If the servant violates a rule of his master and such violation is the proximate cause of his injury, he is guilty, as matter of law, of contributory negligence.

7. SAME—RAILROADS—OPERATION OF TRAINS.

Under regulations promulgated by defendant railroad company, advising its employees that no signal need be sent out by a train inside the yard limits unless curves or foggy or stormy weather caused the view of an approaching train to be obstructed, it was a question of fact whether plaintiff, whose train was standing near a curve, at a time when snow was falling, should have signaled another freight train that he knew might be sent out behind him.

8. SAME.

And although the rule absolutely required that signals should be sent out if storm, darkness, or the location of plaintiff's train demanded, it was not error prejudicial to defendant to permit the jury to consider the matter of notice to him that a special train might follow as tending to add to plaintiff's obligation.

9. MASTER AND SERVANT—NEGLIGENCE—DEGREES.

Where the injury occurred, either because of the negli-

gence of plaintiff or because of negligence of a fellow-servant, and the jury were instructed that if both were guilty of negligence, in that each neglected some duty imposed by the rules, which, if performed would have prevented the accident, their verdict should be for defendant, and it appeared that the jury must have found that plaintiff was not chargeable with negligence, no prejudice to defendant was made out even if no question or issue relating to the degrees of negligence should have been submitted.

10. CONSTITUTIONAL LAW—MASTER AND SERVANT—FELLOW-SERVANT.

Nor is Act No. 104, Pub. Acts 1909, unconstitutional on the ground that a greater measure of damages obtains under the statute as to railroad corporations in case of the death of an employee than if he survives: the intent of the legislature was to compensate the persons in whose interest the action was instituted as in other cases; and no double liability is created so as to permit suits to be brought by the administrator successively in behalf of decedent and in behalf of the class mentioned by the statute.

ON REHEARING.

1. CARRIERS—MASTER AND SERVANT—FEDERAL EMPLOYERS' LIABILITY ACT—STATUTES—AMENDMENT.

While plaintiff's remedy, under uncontradicted testimony in behalf of defendant showing that the train which he was engaged in operating contained cars that were billed to points outside the State of Michigan, must be held to have been under the Federal liability statute (35 U. S. Stat. 65, chap. 149), rather than under the State law (Act No. 104, Pub. Acts 1909), nevertheless, the court, on error, will treat the declaration as amended, so as to permit recovery under the act of Congress, where the pleading sets out sufficient facts to charge defendant with liability if the facts relating to interstate commerce had been averred.

2. SAME—STATUTES—DAMAGES.

The damages of a plaintiff who survived his injuries are the same under State and Federal statutes.

Error to St. Clair; Tappan, J.   Submitted April 9,

1912. (Docket No. 84.)   Decided May 28, 1913. Rehearing denied January 5, 1914.

Case by Reuben J. Fernette against the Pere Marquette Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Bills, Streeter & Parker* and *Lincoln Avery,* for appellant.

*Stevens, Graham & Stevens,* for appellee.

The cut shown on the opposite page is a reproduction of the blue-print referred to in the opinion.

An examination of the map published herewith will aid to a proper understanding of the issues involved in this case. The main line from Toledo to Saginaw runs practically north and south. It crosses the Michigan Central nearly at right angles at the point "B." Just south of the Michigan Central and west of the Pere Marquette is located the signal tower for the crossing. This tower is designated as "Hoyt." South from the crossing at a distance of 400 feet stands the "Home Signal." Still further south 1,200 feet stands the "Distant Signal." About 300 feet south from the "Distant Signal" there comes in upon a curve from the east defendant's main line from Port Huron. From this point north a distance of some 1,600 or 1,700 feet the main line from Port Huron and the main line from Toledo run side by side upon the same right of way. They are joined by a switch just south of the Michigan Central crossing. A post set at a point 4,900 feet south of the Michigan Central crossing marks the yard limit on the Toledo main line. There is no post marking the yard limit on the Port Huron line. At the "Home Signal" there enters from the west a wye connecting with the Saginaw Belt Line. The time-table in use by defendant at the time of the

accident names "Hoyt" as one of the 21 stations between Saginaw and Port Huron. It is located just south of Saginaw, the running time between "Hoyt" and Saginaw being but five minutes. The time-table contains the following: "First class trains will register by register ticket at Hoyt and Tappan. Second, third class and extra trains will register in books at Hoyt and Tappan." A telegraph operator is maintained at Hoyt. There is neither a water tank nor coal dock at this point upon defendant's lines. Passengers do not take or leave defendant's trains at Hoyt nor is freight accepted or delivered there.

The plaintiff was rear brakeman upon an extra freight train (No. 174) which left Port Huron very early in the morning of January 20, 1910. This train arrived at Hoyt about 6 o'clock. Finding "Home Signal" set against it, it stopped with the engine about 100 feet south of the "Home Signal" and the rear end of the train just outside the "Distant Signal." It stood in this position eight or ten minutes when it was struck in the rear by extra freight train No. 399, also running from Port Huron to Saginaw. Plaintiff's train consisted of two engines, twenty-five loaded cars, five empties and a way car. Extra No. 399 when it left Port Huron consisted of a single engine and ten cars. Four cars were set off at Yale, leaving but six in the train at the time of collision.

When plaintiff's train arrived at Hoyt no flag, light, or other signal was placed out to protect the rear of the train. The engineer of extra No. 399 saw plaintiff's train when he was about 600 or 700 feet distant. He made every effort to stop but was unable to do so. His engine crashed into the way car of extra 174, practically demolishing it. Plaintiff was in the way car at the moment of impact and received injuries for which he seeks compensation in this suit.

Defendant's rule No. 99 is as follows:

"When a train stops between stations or is delayed under circumstances in which it may be overtaken by another train the flagman must immediately go back with danger signals with not less than two torpedoes, and, in addition, by day, with a red flag, and, in addition, by night, with a red and white light and not less than two red fusees; and at night place a lighted red fusee in the center of the track, not less than 500 feet behind the rear of the train, proceed by day or night a sufficient distance from the rear of the train to stop any train moving in the same direction. The flagman must go not less than one-half mile (16 telegraph poles) distant from the rear of his train until a point is reached where the danger signal can be seen not less than one-quarter of a mile (8 telegraph poles) by the engineman of an approaching train, at which point the flagman will at once place two torpedoes on the rails opposite each other so that when exploded they will make one report. The flagman will remain at such point until a train has arrived or until he is recalled."

Rule 91c reads:

"All extra and delayed third class freight trains must pass into and through all stations and must approach side tracks, water tanks and fuel stations with train under control, expecting to find a train at such point. Speed must be reduced so that it shall not be possible to strike any train that may be within the station switches or that may be taking fuel or water. In such cases the responsibility for safety rests on the approaching train. When fog, snow, darkness, dangerous places or other circumstances render it necessary, a train occupying main track at a station must, as an additional precaution, be protected as per rule 99. This will not, however, relieve the approaching train of responsibility for accident."

Rule 98d is as follows:

"Rule 98d. When a train is occupying the main track inside of yard limits at stations where yard limit posts are erected or between switches at other stations no signal will be sent out to protect against a train of the same class, except where by curves, foggy or stormy weather the view of an approaching

train is obstructed in which case both trains are responsible in case of collision, but an inferior train must at all times clear or protect against a superior train."

It was the contention of plaintiff that his train (extra 174) was standing at a station (Hoyt) and was therefore protected under the terms of rule 91c; that under said rule it was the duty of the engineer of extra 399 to approach Hoyt in such a manner as to render a collision impossible and, therefore, a collision having occurred resulting in injury to plaintiff, he could recover therefor against the defendant because of the negligence of his fellow-servant (the engineer of extra 399) under the provisions of Act 104, Public Acts of 1909.

Defendant's contentions are:

*First.* That, even conceding the accident and consequent injury to plaintiff was the direct and proximate result of the negligence of Hopkins, the engineer of extra 399, there can be no recovery because Act No. 104 of the Public Acts of 1909 is unconstitutional.

*Second.* That, independent of the question of the constitutionality of the statute, the defendant was entitled to a directed verdict because: *(a)* "Hoyt" is not a station within the meaning of rule 91c; and *(b)* if "Hoyt" is a station within the meaning of that rule plaintiff's train was not standing at that station at the time of the collision, but was standing between stations and was therefore governed by the provisions of rule 99.

*Third.* It was the duty of the court to construe and apply the rules.

*Fourth.* Plaintiff's failure to obey rule 99 was the proximate cause of the accident.

*Fifth.* The court erred in the charge as given.

*Sixth.* The court erred in the admission and exclusion of testimony.

BROOKE, J. *(after stating the facts).*  Consideration
will be given to the positions of defendant in their
order.

*First.* This question is now settled adversely to the
contention of defendant. *Sonsmith* v. *Railroad Co.,*
173 Mich. 57 (138 N. W. 347).  In reaching the con-
clusion set out in the opinion in that case, this court
gave careful consideration to the arguments upon that
question contained in defendant's brief in the case at
bar.

*Second.* *(a)* Was "Hoyt" a station within the mean-
ing of rule 99c?  We are disposed to hold that it must
be so considered.  It is true that the ordinary busi-
ness usually transacted at a railway station was not
done by the defendant at this point.  Many of the
characteristics of a station, however, it unquestionably
had.  In the first place it was designated as a station
on defendant's time card, a telegraph operator was
maintained there and books were kept in which all
second, third class and extra trains were required to
register.  This rule necessitated the stopping of the
train, or at any rate compelled it to run so slowly that
the conductor could jump off, register, and then board
it while in motion.  Moreover it was situated at a
point within the yard itself.  The yard limit on the
Toledo main line was fixed at a point 4,900 feet south
of the Michigan Central crossing.  The appellation
"Hoyt" as shown by the exhibits seems to have been
applied to the signal tower only which is located di-
rectly where the two roads cross.  While the signals
were operated from the tower and the books were kept
there, we think it cannot be said that the appellation
covers the structure only but should be applied rea-
sonably to include the environment.  A further reason
for regarding "Hoyt" as a station is furnished by the
fact that the defendant issued running orders to its
trainmen from Port Huron (or other points) to

"Hoyt." The dictionary definition of the word "station" is not of much aid in determining the character of the place in question. Whatever the technical or restricted meaning of the word may be, in construing rule 91c, it certainly would cover any place where trains usually or ordinarily stopped. The very purpose of the rule is to protect trains at such points from the possibility of collision from the rear. No train can make the crossing unless the target is set in its favor. If the target stands against it as it did in the case of the plaintiff's train on the morning in question, the train must wait until the obstruction is removed and the signal to proceed is given. At such a point, therefore, there is always a possibility that a train will be held up, and the engineer of a train governed by the rule is bound to take such precaution as is therein prescribed to avoid a collision.

*(b)* Was plaintiff's train at the station? The rule (91c) provides that:

"All extra and delayed third class freight trains must pass into and through all stations and must approach side tracks, water tanks and fuel stations with train under control expecting to find a train at such point. Speed must be reduced so that it shall not be possible to strike any train that may be within the station switches or that may be taking fuel or water."

It is said that this train was not at the station, that it was not within the station switches, and that it was not within the yard limit as there is no post on the Port Huron main line marking such limit. The engine of plaintiff's train stopped at a point about 100 feet south of the home signal. This was practically as close as it could go to the signal tower so long as the target was set against it without being derailed. We think the word as used in the rule should be held to be broad enough to cover so much of the track adjacent to the structure as is commonly used

by trains when they are compelled to stop by the adverse signal. It is true the train was not within station switches but it was in the immediate vicinity of side tracks in approaching which the rule commands caution.

We are of opinion, too, that it must be said that plaintiff's train stood within yard limits at the time of collision. While there was no post on the Port Huron main line defining the yard limit there was such a post on the Toledo main line, and it was located some 3,000 feet south of the point where the rear end of plaintiff's train stood at the time it was struck. It seems scarcely reasonable to say that a train standing upon the Toledo main line would be protected because within the yard limits while one upon the Port Huron main line, only a few feet distant and upon the same right of way, would not be so protected.

*Third, fourth and fifth.* We quite agree with counsel for defendant that it was the duty of the trial court to construe and apply the rules so far as was possible under the facts of the case. *Great Northern R. Co.* v. *Hooker,* 170 Fed. 154, 95 C. C. A. 410; *Northern Pacific R. Co.* v. *Cummiskey,* 137 Fed. 508, 70 C. C. A. 92.

This court has held that the violation of a rule by an employee where such violation is the proximate cause of the accident is negligence as a matter of law. *Enright* v. *Railway Co.,* 93 Mich. 409 (53 N. W. 536); *Whalen* v. *Railroad Co.,* 114 Mich. 512 (72 N. W. 323); *Fluhrer* v. *Railway Co.,* 121 Mich. 212 (80 N. W. 23); *Veit* v. *Railroad Co.,* 150 Mich. 358 (114 N. W. 233); *Moyer* v. *Railroad Co.,* 159 Mich. 645 (124 N. W. 542).

There is some testimony in the record which indicates that it was snowing at the time of the accident. There is also some difference of opinion as to the condition as to light or darkness at the moment of col-

lision. It is unquestioned that plaintiff's train stood at a point in the straight track just beyond a curve. Whether these conditions imposed a duty upon plaintiff to protect the rear of his train under rule 91c was, we think, fairly a question of fact for the jury under proper instructions. Upon this point the court charged as follows:

"The essential questions of fact for your determination are (1) whether or not the defendant company was guilty of negligence that was the proximate cause of the accident. (2) Whether the plaintiff himself was guilty of contributory negligence that was the proximate cause of the accident. (3) Whether the negligence of the defendant and the negligence of the plaintiff concurred to produce the accident. And if you find that the negligence of the defendant and the contributory negligence of the plaintiff both concurred in producing the accident, then you are to determine from the proofs whether the contributory negligence of the plaintiff was of less degree than the defendant's negligence; and that means, of course, the negligence of the engineer, Hopkins. You are further instructed that the negligence of either the plaintiff or defendant is the proximate cause of the accident, if you find from the proofs that it was the reasonable, natural, and probable cause that in itself produced the accident. In determining these questions of fact if you find that plaintiff's negligence was the proximate and moving cause of the accident and of equal or greater degree than the negligence of defendant, then the plaintiff cannot recover. If, however, you find that the negligence of the defendant and the contributory negligence of the plaintiff concurred to produce the accident and you also find as a fact that the negligence of the plaintiff was of a lesser degree than the negligence of the engineer, Hopkins, then the plaintiff may recover.

"So far as it relates to train No. 174,240 upon which plaintiff was injured, and also to No. 399 in charge of engineer Hopkins, Hoyt was a station point for the purpose of registering these trains. Under the rules of the company and the time-table introduced in evidence, it was the duty of Conductor Hudson, in charge

of train No. 174,240, to sufficiently stop his train to register it. If it was necessary to bring the train to a full stop in order to complete registration as the rules require, then it was proper to stop the train. Now, while you are to consider that Hoyt is a station for the purpose of registration of these extra trains, as I have explained, and Conductor Hudson had a right to bring his train to a full stop for that purpose, yet I shall leave it for you to determine as a question of fact whether the Hudson train was so situated at the time of the accident as to require the plaintiff, as the rear brakeman, to make use of danger signals as specified by rule 99, or to take any other precaution specified by any other rule received in evidence.

"Now, gentlemen, considering the duty of the plaintiff, Fernette, in the matter. You are to take into consideration that he had received information that a special freight train might be sent out after his train, together with all other surrounding conditions. While you are to regard Hoyt as a station for the purpose of registration of that Hudson train, and that Hudson's train was properly brought to a stop at that point, yet it is for you to determine from all the proofs whether or not the plaintiff should have put out danger signals to protect his train, as required by rule 99 or any other rule governing the situation. In considering his duty in this respect you will recall and take into consideration rules 91c, 98d, 99, and all other rules received in evidence that bear upon the stoppage of the two freight trains at Hoyt at the time of the accident, and the duties of plaintiff and other employees in charge of them. In this connection you will consider the character of the place where the trains collided, the condition of light or darkness, storm, and so forth. You will determine whether or not on account of the location, storm or darkness, and the information that he had as to the possibility or probability of a following extra train he should have immediately protected his train upon its stoppage at Hoyt. If, on account of storm or darkness and location, the engineer, Hopkins, did not and in the exercise of ordinary care and caution could not see the Hudson train in time to prevent the accident, and these conditions of weather, light, and location were such that under the rules plaintiff should have protected

his train by placing out warning signals as required, his failure to do so constitutes contributory negligence that becomes the proximate cause of the accident, and he cannot recover, if you so find.

"Now, as to the duty of Hopkins. In judging of the duty of Engineer Hopkins in the management of his train, you are to take all the proofs as to the conditions of light, darkness, storm, and so forth into consideration. You should also consider the evidence to the effect that he was informed that a special train had preceded his train. You should consider whether he could see and distinguish the Hudson train from a point where it entered upon the curve at its eastern end about a half mile from Hoyt. If, owing to darkness or storm he was not able to see or distinguish the train ahead of him, he had a right to continue with his train using only such precautions as the rules prescribe. If he was doing all that a careful engineer should in the management of his train, and was taking all the precautions that the rules of the company prescribe for existing conditions, and then acting carefully and prudently he could not see the Hudson train in time to stop his own train and prevent the collision, and you also find that Fernette in the exercise of his duties under the rules of the company should have put out warning signals for the following train, then Hopkins was not guilty of negligence that was the proximate cause of the accident. If, however, you are convinced that Engineer Hopkins saw, or even though he did not see, but in the exercise of ordinary care and prudence he should have seen the Hudson train from the head of the curve or from any intervening point when he could have brought his train to a stop and prevented the accident, then he was guilty of negligence in colliding with the Hudson train. It would be his duty to avoid apparent danger if he could do so in the exercise of skill and care. This is true wholly irrespective of any and all rules. He is presumed to have seen and known of any danger that a man of ordinary care and prudence should have seen and known under like conditions. Failure to do so on his part would be negligence.

"If under these instructions, you find that both Engineer Hopkins and plaintiff Fernette were guilty of a violation of the rules of the company, or were

otherwise each guilty of negligence, and that the negligence of both concurred to produce the accident, then you are to determine whether the proofs show that the contributory negligence of the plaintiff was of lesser degree than that of Engineer Hopkins. If they fail to so establish the fact, plaintiff cannot recover. If they do, he may recover as I have explained. * * *

"If the jury find that Hopkins, the engineer of the following train, and Fernette were both guilty of negligence in that they each neglected some duty imposed by the rules which if performed would have prevented the accident, then your verdict should be for the defendant, for in such case the negligence of each would be equal, and where it is equal there can be no recovery."

This portion of the charge is criticised by counsel for defendant in several particulars. They say that the court—

"Submitted to the jury, as a question of fact, the construction, interpretation, and application of the rules at the precise point where the plaintiff's train was standing when it was struck."

And again:

"The court should have definitely charged the jury which rule applied as a matter of law."

It will be noted that the court did charge that Hoyt was a station and that plaintiff's train was properly brought to a stop there. As already pointed out, we are of opinion that it cannot be said as a matter of law that plaintiff was not negligent in failing to protect the rear of his train even though rule 91c applied. His duty to so protect arose under this rule "when fog, snow, darkness, dangerous places or other circumstances render it necessary." By instructing that Hoyt was a station it is obvious that Hopkins, the engineer of extra 399, was bound to use the caution demanded by rule 91c. The alleged darkness and falling snow and the curve at that point were such conditions, however, as might be held by the jury to have

excused his failure to comply with the terms of that rule, in which event the jury must have found that the proximate cause of the accident was plaintiff's failure to protect his train under the exceptional conditions enumerated in rule 91c.

Counsel for defendant say:

"The facts are undisputed and it was a question of law for the court to say whether rule 99 or rule 91c applied."

We think it clear that the controlling facts are not undisputed. Plaintiff and his fellow brakeman both testified that it was not snowing at the time of the collision and that "it was fairly good daylight, you could see quite a distance." While Hopkins testified in behalf of defendant that:

"It was snowing quite a little. It was quite dark yet. As dark as it was any time during the night."

The court charged the jury that:

"You are to take into consideration that he (plaintiff) had received information that a special freight train might be sent out after his train. * * * You will determine whether or not on account of the location, storm, or darkness, and the information that he had as to the possibility or probability of a following extra train he should have immediately protected his train upon its stoppage at Hoyt."

It is true, as urged by defendant, that the rules do not vest any discretion in the trainmen. Rule 91c requires the trainmen to observe the cautionary measures "expecting to find a train at such a point," and rule 99, under the conditions there set out, as obviously imposes the enumerated cautionary duties quite irrespective of the fact that the trainman has or has not knowledge of an on-coming train. But how was defendant prejudiced by the instruction? It simply permitted the jury to consider an immaterial fact in determining whether or not plaintiff was negligent in

not protecting his train. It was a fact, too, which added to plaintiff's obligation instead of diminishing it. If considered by the jury it was prejudicial to plaintiff rather than to defendant.

We are disposed to agree with counsel for defendant that this was a case where "there was no question of degrees of negligence to submit to the jury." We think that this unfortunate accident occurred through the negligent act of either the plaintiff or of Hopkins but not of both. But again we inquire how was defendant prejudiced by this instruction. The jury were plainly told that if both plaintiff and Hopkins—

"Were guilty of negligence in that they each neglected some duty imposed by the rules, which, if performed, would have prevented the accident, then your verdict should be for the defendant, for in such case the negligence of each would be equal, and where it is equal there can be no recovery."

This instruction was given after the jury had retired and had been recalled upon request of defendant's counsel for the purpose of receiving it. By their verdict the jury must have found that plaintiff was not guilty of negligence in failing to protect his train in accordance with either rule 91c or 99. The question of degrees of negligence, therefore, disappears from the case in the light of this instruction and of the verdict.

We do not desire to be understood as determining that the rule laid down in the last foregoing excerpt from the charge is the correct rule; that question is not now before us.

*Sixth.* Errors are assigned upon the admission and exclusion of certain testimony. In view of our conclusions upon the meritorious questions involved they become unimportant.

We find no reversible error in the record and the judgment is affirmed.

BROOKE, J. Since the foregoing opinion was written a motion for rehearing has been made in the case of *Sonsmith* v. *Railroad Co.,* 173 Mich. 57 (138 N. W. 347).

It is admitted that in this case, as in the *Sonsmith Case,* the employee having survived his injuries and himself begun the suit, the measure of the damages recoverable under this statute and the common law is the same. But it is said that if an injury results in the death of the injured person, the measure of the damages recoverable under this act is not the measure of the damages otherwise recoverable and is greater and more onerous. As a consequence, so the argument goes, common carrier railroads are burdened beyond others in like cases offending and the statute is therefore invalid. The specifications of this contention appear to be two, one that the administrator is in terms permitted to recover for the class entitled thereto "all damages which may result from the negligence," etc.; the other that successive actions may be brought in different interests, as by the personal representative in the interest of the deceased and also in the interest of the class of persons mentioned in the statute. In part the last stated position is grounded upon section 6 of the law, which is:

"Nothing in this act shall be held to limit the duty of common carrier railroad companies, or impair the rights of their employees under existing laws of the State."

The act in question is like many others which rather crudely express the legislative purpose and yet employ words and terms from which the purpose may be fairly determined. There is involved in any theory of an action for damages for personal injuries the idea that plaintiff has suffered injury for which a pecuniary compensation may be recovered. The judgment is supposed to be the compensatory measure of the damages sustained by the plaintiff. The words em-

ployed in the statute import pecuniary damages in an
amount which will compensate the persons in whose
interest the suit is begun.   Damages which may re-
sult to them is, we think, the liability intended to be
established by the act.   It has been said of a similar
provision of a similar act, in comparing it with 9
and 10 Vict., chap. 93, known as Lord Campbell's Act:

"The distinguishing features of that act are identi-
cal with the act of Congress of 1908, before its amend-
ment: *First*, it is grounded upon the original wrong-
ful injury of the person; *second*, it is for the exclusive
benefit of certain specified relatives; *third*, the dam-
ages are such as flow from the deprivation of the
pecuniary benefits which the beneficiaries might have
reasonably received if the deceased had not died from
his injuries." Vide Lurton, Justice, in *Michigan
Cent. R. Co.* v. *Vreeland,* 227 U. S. 59 (33 Sup. Ct.
192).

As to the second specification, it is to be said that
the act in question does not provide that an action
begun by the injured employee, or that the right of
action given him by the act, shall survive his death.
It appears to be contended that the right survives by
virtue of 3 Comp. Laws, § 10117 (5 How. Stat. [2d
Ed.] § 12761), which provides that:

"In addition to the actions which survive by the
common law, the following shall also survive; that is
to say, actions   *   *   *   for negligent injury to
persons.   *   *   *   "

It has been held that the right of action which sur-
vives under this section is distinct from that given by
3 Comp. Laws, § 10428 (5 How. Stat. [2d Ed.]
§ 13703), to the personal representative for the pecun-
iary injury resulting from the negligent injury.   It
has never been held or supposed that there could be
a right of action under the survival act and also a
right of action under the death act.   It was said
in *Carbary* v. *Railway,* 157 Mich. 683. 685 (122 N. W.
367):

"But it must be admitted that there is not a double remedy, and that the existence of one cause of action is entirely inconsistent with the existence of the other."

We think it clear that the right of action given by Act No. 104 to the injured employee survives his death and may be begun by his personal representative under 3 Comp. Laws, § 10117, but that no double liability is thereby created.

The obvious purpose of the act in question is to change the common-law rules as to liability of common carrier railroads and not to interfere with or change the measure of damages as already fixed by existing law. Section 6 of the act quoted above is persuasive of that intent and the fact that the act contains no repealing clause is further evidence thereof.

STEERE, C. J., and MOORE, MCALVAY, STONE, and OSTRANDER, JJ., concurred.

ON REHEARING.

BROOKE, J. In the original opinion handed down in this case (ante, 653), it was held that Act No. 104 of the Public Acts of 1909 was constitutional under the authority of Sonsmith v. Railroad Co., 173 Mich. 57 (138 N. W. 347). In the motion for rehearing it is pointed out that in the instant case a reason exists for holding the act unconstitutional which was absent in the Sonsmith Case.

It is shown by the record that the two trains which came into collision were running between points within the State of Michigan, and that in each of the trains there were two cars carrying merchandise billed to points outside the State.

It is defendant's contention that, because of this fact, plaintiff, at the time of his injury, was engaged in interstate commerce, and, therefore, if entitled to recover at all, could recover only under the Federal

employers' liability act (Act of April 22, 1908, 35 U. S. Stat. 65, chap. 149).

It is further urged that Act No. 104, Public Acts of 1909, should be held unconstitutional because it is not limited in its terms to the liability of common carriers to their employees while employed in intrastate commerce.   It is held in *Second Employers' Liability Cases*, 223 U. S. 1 (32 Sup. Ct. 169), that the Federal act is plenary, exclusive, and supersedes State legislation covering the same field.   It may be assumed that the legislature, in passing the act in question, had no intention of regulating interstate commerce, a subject wholly within the jurisdiction of Congress.   We do not understand it to be questioned that the State may, within constitutional limitations, impose proper regulations upon intrastate commerce.   We have held that the act in question does not constitute an infraction of those limitations *(Sonsmith Case)*.   We are of opinion, therefore, that the second point relied upon is untenable.

The first question remains.   A train, operating only between two points within the State, and carrying merchandise only to destinations within the State, would clearly be subject to the regulatory provisions of the State act.   Does the fact that it happens to carry one or more cars billed to a foreign destination rob it of its character as a factor in intrastate commerce?

There can be no doubt that, under such circumstances, the entire train is impressed with the qualities of a Federal agency of interstate commerce *(Pedersen* v. *Railroad Co.,* 229 U. S. 146 [33 Sup. Ct. 648], and cases there cited) and as such is subject to the regulatory provisions of the Federal act.   Can a train, engaged in both interstate and intrastate commerce at the same time, be held to be controlled by both the Fed-

eral and State acts? A careful examination of the Federal authorities convinces us that it cannot. In *St. Louis, etc., R. Co.* v. *Seale,* 229 U. S. 156 (33 Sup. Ct. 651), it is said:

"If the Federal statute was applicable, the State statute was excluded by reason of the supremacy of the former under the National Constitution. *Second Employers' Liability Cases,* 223 U. S. 1, 53 (32 Sup. Ct. 169) ; *Michigan Central R. Co.* v. *Vreeland,* 227 U. S. 59, 67 (33 Sup. Ct. 192)."

We, are, therefore, bound to hold that plaintiff may recover only under the Federal statute.

His declaration, while it counts upon neither act specifically, was properly held by the learned trial judge to be based upon the liability fixed by the State act. This follows because of the fact that there is no averment in the declaration that, at the time of the accident, defendant was engaged in interstate commerce. At the time plaintiff commenced his action that fact could not have been known by him and could have been ascertained only with great difficulty and trouble, if at all.

Defendant was in possession of all the facts touching upon the matter and upon the trial promptly put them in evidence as a matter of defense. Should plaintiff be held to be debarred from recovery because of his failure to aver in his declaration a fact of which he was in ignorance, and which, in the nature of things, he could not ascertain?

We think it would be a reproach to the administration of justice to so hold. It should be borne in mind that the declaration sets out facts which would impose a liability upon defendant under the Federal act, if it had charged that, at the time of the collision, defendant was engaged in interstate commerce. We are of opinion that it was not necessary for plaintiff to plead either statute, but that, upon the coming in of

the proofs, it was the duty of the trial court to permit an amendment of the pleadings to conform thereto. It may be that, in case of the death of an injured employee, a different measure of damages is provided by the two acts. If so, the trial court will instruct the jury as to the proper rule under the applicable act. In this case plaintiff, having survived his injury, the measure of damages would, it appears, be the same under both acts. Our statute of amendments is extremely liberal. 3 Comp. Laws, §§ 10272, 10273 (5 How. Stat. [2d Ed.] §§ 12973, 12974).

Under its provisions it is the duty of the appellate court, as well as of the trial court, to make such amendments as justice requires, having due regard for the rights of parties. Following this course, we will treat plaintiff's declaration as amended to aver that defendant was engaged in interstate commerce at the time he received his injury.

The rehearing is denied.

STEERE, C. J., and MOORE, MCALVAY, STONE, and OSTRANDER, JJ., concurred. KUHN and BIRD, JJ., did not sit.