SONSMITH v. PERE MARQUETTE RAILROAD CO.

1. RAILROADS—MASTER AND SERVANT—NEGLIGENCE.

There was sufficient evidence of negligence to warrant submitting to the jury plaintiff's claim that the switching crew of defendant railway corporation was guilty of negligence in failing to give warning to the crew of a standing train that they were about to couple certain cars on the train, at a time when plaintiff in the performance of his duties as head brakeman was between the engine and one of the cars, although the coupling was carefully and properly made, and the plaintiff had not displayed a flag or signal to show his presence between the standing cars.[1]

2. SAME—CONTRIBUTORY NEGLIGENCE.

Defendant's rule or bulletin requiring car repairers and other employés having occasion to work on, under, or about cars to display a flag which would protect the car from removal, coupling, etc., could not be said as matter of law to apply to a brakeman, who stepped between the locomotive and freight cars to shut off the air pressure from the engine to the rest of the train.

3. CONSTITUTIONAL LAW — MASTER AND SERVANT — FELLOW-SERVANTS—STATUTES.

Act No. 104, Pub. Acts 1909, abolishing the fellow-servant rule as to common carrier railroads, is not unconstitutional within the provisions of the fourteenth amendment of the Federal Constitution forbidding States to deprive persons of life, liberty or property without due process of law, nor is it invalid under the similar provisions of the Constitution of Michigan, § 16, art. 2.[2]

4. SAME.

It does not deprive railroad corporations of the equal protection of the laws.

5. SAME—VESTED INTERESTS.

A person has no property, no vested interest in any rule of the

[1] As to servant's assumption of risk of master's breach of statutory duty, see notes in 6 L. R. A. (N. S.) 981; 19 L. R. A. (N. S.) 646; 22 L. R. A (N. S.) 634; 33 L. R. A. (N. S.) 646.

[2] For validity, generally, of statute abrogating fellow-servant rule, see note in 12 L. R. A. (N. S.) 1040.

common law, which is only one of the forms of municipal law and is no more sacred in character than any other.

6. SAME.
   The tendency of the changes made by the act is to compel carriers to avoid or prevent the negligent acts and omissions which are made the basis of the right to recover, thereby promoting the safety of employés, and advancing commerce in which they are engaged.

7. SAME.
   The classification of railroads to be affected by the act so as to include only common carriers is not arbitrary or unauthorized.

8. SAME—RAILROADS—RIGHT OF CONTRACT.
   Section four of said act is not invalid because it unduly restricts the employer's right to contract by depriving the defendant of the benefit of any contract against liability, or of indemnity, as an absolute defense.

9. SAME—DEGREES OF NEGLIGENCE—COMPARATIVE NEGLIGENCE.
   The legislature had power to provide that plaintiff might recover if his negligence was less in degree than that of the employé causing his injury: and the provisions of section two are valid and do not interfere with the established judicial power under the Constitution.

10. SAME.
    In order to recover plaintiff must establish actionable negligence: the court is not deprived of the duty to determine whether evidence is presented tending to show the same.

11. EVIDENCE—DAMAGES—EARNINGS.
    Testimony showing that plaintiff was an extra, not a regular, brakeman, that he had earned about $38 a month before he received the injury, that he had worked 16 days in one month, and 13 in another, that his expectancy was slightly more than 40 years, warranted the admission of a computation made by a witness showing the present worth of annual earnings at $800 a year, the total that plaintiff could earn at the rate of wages he received.

Error to Saginaw; Kendrick, J. Submitted December 11, 1911. (Docket No. 48.) Decided November 8, 1912. Rehearing denied May 28, 1913.

Case by George Sonsmith against the Pere Marquette

Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Bills, Streeter & Parker* (*S. L. Merriam* and *Weadock & Weadock*, of counsel), for appellant.

*Fred L. Travers* (*Miles J. Purcell*, of counsel), for appellee.

OSTRANDER, C. J.   On the 29th of November, 1909, the stone run train, so called, consisting of 35 or 36 cars, was made up on the main track of the Bad Axe Division of defendant's road; the track running substantially east and west. The plaintiff was employed by the defendant as an extra brakeman, and was assigned to duty on the stone run train. Some time between 4 and 5 o'clock in the morning of November 29th, he reported himself at the yards, arriving there before the locomotive arrived, or any of the trainmen connected with his run. The train was equipped with air brakes and automatic couplers. It was made up by a switching crew employed in the yards, the duties of which crew consisted in assembling the cars and coupling them together (they coupled by impact), leaving the connections for the air to be made by the car inspectors.

Testimony for the plaintiff tended to prove that he found the train apparently complete except the locomotive, with the caboose or way car at the rear, unlighted, and the air couplings all made. When the locomotive, the other brakeman riding on it, came into the yard, plaintiff turned at least one switch to permit it to come in upon the proper track, and when it backed down to the train and was connected therewith, as it was by impact, he made the connection of the air hose between the locomotive and the first car of the train. His testimony tends further to prove that he arranged with the other brakeman that he, plaintiff, should act as head brakeman; that the other brakeman, going down the train, lighted the lamps in the caboose, including the markers on the rear

and the lamp in the cupola of the way car. The locomotive having been coupled to the train, the plaintiff proceeded down the side of the train with his lantern, and at the rear end of the first car discovered a leak in the air hose, examined it, and told the engineer what he had discovered. The engineer with a torch examined the point at which the air was escaping, plaintiff being on the other, the north, side of the train. Some one, plaintiff says, said: "Shut off the air." He, plaintiff, proceeded to the rear of the engine (tender) to turn the angle cock which controlled the admission of air into the train. In doing this, he stepped in between the rails and the car and tender, but, before he had reached the angle cock, a movement of the train from the rear took place, he was caught by the heel of his right foot, thrown down, and his leg was so injured that amputation was necessary. He produced testimony tending to prove that the movement of the train which resulted in his injury came about in the following manner: As it stood, made up in the yard, the stone run train blocked a spur track. The switching crew desired to use this spur track. The switching crew therefore uncoupled several cars, four or five or six, with the way car, from the rear of the stone run train and pulled these cars away, thus opening the spur track. Later they pushed the cars so detached from the stone run train into their original position, and did this at the instant when plaintiff had placed himself between the rails at the head of the train next the engine. He seeks in this suit to recover damages for the injury he thus received. In his declaration he alleges his duties in the premises as follows:

"To assist in the switching of cars in connection with his work as brakeman, to attach or couple the air brakes between the cars, and between the train and the engine when required to do so, and to do and perform such other usual, ordinary, and necessary things as are incumbent upon and incidental to the work of a brakeman in performance of his duty as such in the transportation of freight and the safety of the property of said company and that to be transported."

He alleges the duties of the defendant to have been: ·

"Not to push, switch, or shunt cars against the train or cars about or upon which said plaintiff was at work without first giving said plaintiff notice thereof; not to attach cars to the train about or upon which said plaintiff was at work without notice to him; not to remove cars from the train about or upon which said plaintiff was at work without notice to him; knowing or having good reason to know that employés of said defendant, including plaintiff, were at work upon or about the train, cars, and engine hereinafter referred to, not to remove from said train any car or cars without first giving said employés, including said plaintiff, so at work as aforesaid, and hereinafter described, due and timely notice thereof; knowing, or having good reason to know, that employés of said defendant, including plaintiff, were at work upon or about the train, cars, and engine, hereinafter referred to, not to push, switch, or shunt cars against said train, cars, or engine without first giving said employés, including said plaintiff, so at work as aforesaid, and hereinafter described, due and timely notice thereof."

He alleges the failure of defendant to observe these duties. The declaration does not count upon or refer to any statute of this State.

Plaintiff, who was 23 years of age, with a life expectancy of more than 40 years, recovered a verdict and judgment for more than $12,000, and it is claimed by defendant that for various errors committed upon the trial the judgment ought to be reversed. A motion was made by defendant at the close of plaintiff's case for a peremptory instruction to the jury upon the grounds (1) that no negligence of defendant had been made out; (2) that plaintiff had been shown to be guilty of negligence contributing to his injury; and (3) that the negligence alleged was that of fellow-servants of plaintiff and of the degree of which plaintiff was himself guilty. This motion, as will presently appear, involved a peremptory instruction as to the meaning and effect of certain provisions contained in Act No. 104, Public Acts of 1909, and of the validity of the said act. The motion was denied, an exception was taken,

and error is assigned upon this ruling. The taking of testimony having been concluded, the motion for a peremptory instruction was renewed and again denied, the ruling being followed by an exception. Error is assigned upon certain portions of the charge, and upon exceptions to rulings admitting a certain computation of the present worth of plaintiff's probable earnings and certain impeaching and rebutting testimony. There are other exceptions and assignments of error, but they are not argued in the brief for appellant. If there is no testimony fairly tending to prove that the conduct of defendant's servants which was the immediate cause of the injury was negligent, plaintiff cannot recover. This is so whether Act No. 104, Public Acts of 1909, is or is not valid and applicable legislation.

If the conduct was negligent, still those guilty of it and plaintiff himself were servants of the same master and engaged in a common employment. In such a case, under the rules of the common law, plaintiff cannot recover; and this is so whether he himself was or was not negligent. Whether plaintiff was negligent is of no consequence, unless Act No. 104, Public Acts of 1909, is valid legislation, of the provisions of which plaintiff may have the advantage; in which case his negligence must be compared with that of which the switching crew was guilty.

We have concluded, but not without some misgiving, that there was testimony tending to prove the negligence of the switching crew. That they had the right to uncouple and remove a portion of the train cannot be doubted. That they did this in a proper manner is established. The coupling, when the cars were restored to the train, was carefully and properly made. If the switching crew was negligent, it was because they failed to give warning to the train crew, including the plaintiff, that the coupling, involving a probable movement, though a slight one, of the whole train, was about to be made. There was testimony tending to prove that, when the cars were removed from the train by the switching crew, the way car of the train was lighted and the locomotive connected, and that,

when the cars were restored to the train, there was air in the hose on the standing cars. This, it may be inferred, was notice to the switching crew that the trainmen had arrived, and were probably somewhere about the train, and it is insisted upon the part of the plaintiff that, having this notice, a coupling should not have been attempted without assurance that the trainmen were none of them in a position to be injured, or until after due warning had been given to them of the proposed movement. Defendant says that it had formulated and published certain rules which, if obeyed, would have made it impossible for plaintiff to be injured, upon obedience to which rules the switching crew had the right to rely. There is a rule of defendant which, if it had been obeyed by plaintiff, would have effectually protected him from anything but the results of wanton conduct of the switching crew. It is that—

"Trainmen, car repairers and other employés who have occasion to work on, under, or about cars or engines are forbidden to commence such work, the nature of which requires them to place themselves in a position which might result in personal injury to themselves in case the car or engine should be moved, until they have first protected themselves with the proper signals provided for in this rule. Employés who display the signals herein provided are alone authorized to remove such signals. When a car or engine is thus protected it must not be coupled to nor moved. Other cars or engines must not be placed on the same track so as to intercept the view of these signals without first notifying the workmen."

No such signal was displayed. Defendant had also issued a bulletin order, dated May 11, 1909, reading:

"To Train and Engine Men: Your attention is called to instructions issued some time ago, regarding testing air on freight train before leaving terminals.

"'After the engine is coupled on to the train and the air cut in, the air inspector will start at the head end of the train, and the rear brakeman will start from the rear end; they will move toward each other, meeting about the middle of the train, for the purpose of finding leaks, etc. When this has been done, they will give the

engineer a signal to apply brakes; the engineer will do so, making a twenty (20) pound reduction; the inspector will then start toward the head end, and the rear brakeman toward the rear end, both inspecting the brakes, and seeing that they are all set. On arrival at the caboose, rear brakeman will give the engineer a signal to release brakes, and if they release all right, he will then give a "high-ball" to pull out.'

" Brakeman and inspector will have with them a supply of airbrake defect cards, and tack them on all cars having defective brakes, stating the nature of the defects.

"J. L. HAYES,
"Trainmaster."

Plaintiff was head brakeman, and, according to this bulletin order, owed no duty to inspect the train for the purpose of discovering defects in the brakes and in their operation. But plaintiff says that, when he was injured, he was performing no service such as the rule above stated refers to, and was performing a service in the line of his duty. Upon this subject the trainmaster of defendant, who had charge of the yards at Saginaw and was called as a witness by defendant, testified:

"I say it is the duty of a brakeman of a freight train to put a light at the rear of his train every time he goes between his train to perform his work in the yards, if he should go there. Suppose there is a leak in the air machinery when the air is put through the freight train, and it becomes necessary to cut off the air from the engine, the brakeman or inspector would cut it off. I understand Mr. Sonsmith was injured while he was doing that very thing.

"Q. Then he was in the performance of his duty, wasn't he, in attempting to cut out the air from that train that morning?

"A. Yes, sir."

He further testified:

"Q. Well, the inspection of these brakes have got to be made, haven't they?

"A. Yes, sir.

"Q. It is their train while these brakes are being inspected?

"*A.* Yes, sir.

"*Q.* And they have got to attach the engine to the train; that has got to be done too, of course, before you can get the air through the train?

"*A.* Yes, sir.

"*Q.* The brakemen have got to loosen any hand brakes that may be tight, haven't they?

"*A.* Yes, sir.

"*Q.* They have got to do a number of incidental things, haven't they?

"*A.* Yes, sir.

"*Q.* Before the train departs; that is right, isn't it?

"*A.* Yes, sir.

"*Q.* And yet this train belongs to the switch crew right up to the time the lantern signal is given at night to pull it out?

"*A.* Yes, sir."

The traveling engineer of the defendant testified:

"*Q.* Now, Mr. McLachlan, the duty of the brakeman was to cut out the air from the engine, wasn't it, when he found a leak in the car?

"*A.* Yes; I suppose he would do it as soon as he would get around to it."

The general yardmaster of defendant in charge of the Saginaw yards testified:

"If a brakeman has taken it on himself to go in between the cars and make any repairs, he hasn't any right to do it unless he protects himself in the proper manner, with a red light at the end or red flag being placed out in the center of the drawbar on that train.

"*Q.* But, if the plaintiff happened to cut out the air from the engine, do you call that repairing the train?

"*A.* No; I don't. It is one of the incidental and ordinary duties of a brakeman, when they come in on the road, to shut off their air, and I believe it is the duty of the head brakeman to cut out the air when it is necessary from the engine in the train. It is not his duty to connect the air to the engine and the train. We have car inspectors to do that."

A freight conductor, a witness for defendant, testified:

"*Q.* And the air connections are made by the brake-

man in charge of the train between the engine and the first car?

"*A.* As a general rule. It is not the brakeman's duty, when a leak is discovered in the air machinery, if his train is in the yards, to disconnect the air from the engine.

"*Q.* Now, under the car inspector's duties, let me read you what the duties are in rule 597, and ask if this does not refresh your recollection in regard to the proposition:

" 'They [referring to car inspectors] must couple and uncouple all air and steam connections on passenger trains, carefully examine the couplings in all trains after they are made up and report to the trainmaster any imperfections.'

"Don't that refresh your recollection to the extent that it was one of the duties of the crew, to the extent that it is only the duty of the car inspector by the rule, to connect the air on passenger trains?

"*A.* It is also their duty on freight trains.

"*Q.* Have you got any other rule?

"*A.* Well, it is done, and, if it wasn't their duty, it is a cinch they wouldn't do it. I cannot say how many times I ever saw them disconnect the air from the engine to take out a car for imperfections or defects. Sometimes you have to throw a car out, not very often.

"*Q.* Now, there is no question but what it was the duty of the brakeman to couple up the air to the train in question, is there?

"*A.* Well, they always do. The forward brakeman always takes care of that."

The engineer of the stone run train testified:

"When I noticed this leak, I did not do anything toward trying to remedy it. I did not touch it. I was on the right-hand side of the engine. Sonsmith was on the opposite side. I don't know whether he was holding a light for me or not. I did not make an examination at the time that I noticed this leak, to see what was wrong. It blew my torch out, when he turned the air on it blew my torch out. I didn't make any further examination. About that time the cars moved ahead. * * * When the cars were moved ahead, I was just getting out between the cars, just getting out between the cars after I made this examination. When they moved forward, it indicated there was some one on the rear end of that train. Some engine or car was on the rear end shoving it ahead.

When the leak was noticed, it was the proper thing to cut off the air. I couldn't tell you whose duty it was to cut off the air. Mr. Sonsmith turned it on, and I presume it was his duty to shut it off. I don't know that it was Sonsmith's duty to turn it off. I couldn't say as to that.

"Q. You presume it was his duty?

"A. Well, I don't say for sure for that. I was just getting out from between the cars when they were moved forward, being struck from the rear. I don't remember whether I said anything at the time the cars were moved forward or not. I saw Sonsmith after he was injured. I went to where he was lying on the ground. I saw his injuries. I said at that time that I just got out, and that it was a lucky thing for me that I escaped. They have an inspector that looks after the airbrake connections after the train is made up in the yard. I couldn't tell who makes the air connection between the engine and the train as the engine is being attached to the train. I don't know whose duty it was that morning to make the air connection on this stone run freight train in the yard. I don't know that Sonsmith did it. I didn't do it. I don't know as a matter of fact that it was the duty of one of the brakemen when the engine was coupled to the train in the yard for the brakeman to make the air connection to turn on the air between the engine and the train. I am not positive that they do it right along either. I couldn't tell you whose duty it was to cut off the air if there is a leak in the air connection and that leak is discovered by the brakeman."

Plaintiff testified that he did not see the bulletin order which has been referred to, and never knew of a custom prevailing in the yards of defendant, if it did prevail, which permitted switching crews, without notice to train crews, to take cars from and restore them to a train which had been made up. Among other printed rules and instructions contained in the book furnished by defendant to employés is instruction No. 256, reading:

"Employés of every grade are warned to see for themselves, before using them, that the machinery and tools which they are expected to use are in proper condition for the service required, and trainmen, especially, must examine and know for themselves that the brake shafts and attachments, ladders, running boards, steps, handholds

and other parts and mechanical appliances which they are to use are in proper condition; if not, to put them in proper condition, or see that they are so put before using them."

In view of the foregoing and other testimony, and assuming that the switching crew had the right to take away and restore cars to the train, we cannot say as matter of law, that before attempting to cut off the air from the engine plaintiff was required by rule 26, a portion of which has been set out, to place a signal at the rear of the train between the tracks for his protection; nor can we say that the switching crew, in view of all the circumstances, were warranted in restoring the cars to the train without warning to the trainmen. The proper interpretation of rule 26 does not seem to us to be the one contended for by defendant, nor, as we have seen, is it the interpretation given to it by some at least of its superior agents. We conclude there was testimony from which the jury had the right to find that the switching crew were negligent, and that their negligence contributed to the plaintiff's injury. We come, then, to the questions which involve the meaning and the validity of Act No. 104, of the Public Acts of 1909, which is here set out:

"An act to prescribe the liability of common carrier railroad companies to their employés.

"*The People of the State of Michigan enact:*

"Section 1. Every common carrier railroad company in this State shall be liable to any of its employés, or, in case of his death, to his personal representative for the benefit of his widow and children, if any; if none, then for his parents; if none, then for his next of kin, for all damages which may result from the negligence of any such railroad company or from the negligence of any of its officers, agents or employés, or by reason of any defect or insufficiency due to the negligence of any such common carrier railroad company in its cars, engines, appliances, machinery, track, road bed, works, boats, wharves, coal docks or other equipment.

"Sec. 2. In all actions hereafter brought against any such common carrier railroad company under or by virtue

of any of the provisions of this act to recover damages for personal injury to an employé, or where such injuries have resulted in his death, the fact that the employé may have been guilty of contributory negligence shall not bar a recovery: *Provided*, that the negligence of such employé was of a lesser degree than the negligence of such company, its officers, agents or employés: *Provided further*, that no such employé who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier railroad company of any statute enacted for the safety of employés contributed to the injury of such employé, and such employé shall not be held to have assumed the risk of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé.

" SEC. 3. The words 'railroad company,' as used in this act, shall be taken to embrace any company, association, corporation, or person managing, maintaining operating, or in possession of a common carrier railroad in whole or in part within this State, whether as owner, contractor, lessee, mortgagee, trustee, assignee or receiver.

" SEC. 4. No contract of employment, insurance, relief benefit, or indemnity for injury or death entered into by or on behalf of any employé, nor the acceptance of any such insurance, relief benefit or indemnity by the person entitled thereto, shall constitute any bar or defense to any action brought to recover damages for personal injuries to, or death of such employé: *Provided, however*, that upon the trial of such action, the defendant may set off therein any sum it has contributed toward any such insurance, relief benefit or indemnity that may have been paid to the injured employé, or, in case of his death, to his personal representative.

" SEC. 5. No action shall be maintained under this act unless commenced within two years from the time the cause of action accrued.

" SEC. 6. Nothing in this act shall be held to limit the duty of common carrier railroad companies, or impair the rights of their employés under existing laws of the State.

" SEC. 7. The provisions of this act shall not apply to employés working in shops or offices.

" Approved May 19, 1909."

It is contended that the statute violates section 16 of

article 2 of the Constitution of Michigan, which prohibits depriving any person of life, liberty, or property without due process of law, and that it violates the fourteenth amendment to the Constitution of the United States, which contains a like provision addressed to the States, and the further one that no State shall deny to any person within its jurisdiction the equal protection of the laws.

Counsel for appellant, in addition to briefs filed in the case at bar, have also prepared briefs in the case of *Fernette* v. *Railroad Co.*, pending in this court. Elaborate briefs have been furnished by other counsel in two other pending cases involving the validity of the act in question, and the court has heard in this and other cases oral arguments of counsel. The questions presented are important, since to wholly sustain the contentions of appellant will require us to declare the legislation to be wholly void, a declaration which ought not to be made unless the court is fully satisfied that by no reasonable constructions of its provisions may the act be given a meaning and effect within constitutional restrictions. It must be clear that the legislature has exceeded its constitutional powers, or else the act must be sustained. The Constitution of this State provides, as earlier Constitutions of the State have provided, that:

"The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are altered or repealed." Schedule, § 1.

Two doctrines of the common law adopted in this State particularly applied in actions for personal injuries are, *first*, that no recovery can be had for the results of another's negligent conduct if the person injured, by his own negligence, contributed to his own injury; and, *second*, that one entering into an employment assumes the obvious and usual risks of the employment, among which is the risk that an injury may be received on account of the negligence of other employés engaged in the same general employment.

An exception to the cases in which the last-mentioned doctrine can be applied has been made by this court by excluding those cases in which it appeared that the injury grew out of the violation by the employer of a statute enacted for the safety of the employé, in which excluded cases the rule is that the employé is not held to have assumed the risk arising from the violation of the statute by the employer. *Sipes* v. *Starch Co.*, 137 Mich. 258 (100 N. W. 447). It was also a rule of the common law that, if the plaintiff in an action for negligent injury dies, the right of action dies with him, and, if suit has been begun, the suit abates by his death. The common law has been altered by the legislature by provisions which remove certain disabilities arising at common law after suit is begun. Provision is made for the survival of actions which at common law abated by the death of a party thereto, among them actions for negligent injuries to persons, and such a provision was held to be equivalent to saying that a personal representative of the party might bring and defend such an action. 3 Comp. Laws, §§ 10113, 10117, 10118. *Rogers* v. *Windoes*, 48 Mich. 628 (12 N. W. 882); *Norris* v. *Kent Circuit Judge*, 100 Mich. 256 (58 N. W. 1006). In addition, provision has been made by the legislature for actions by representatives of persons killed by wrongful act, neglect or default in cases where, if death had not resulted, the person injured might have maintained an action for his damages. 3 Comp. Laws, §§ 10427, 10428. It may be said generally that the measure of the damages recoverable under these provisions of the statutes is not the same. Under the law last above referred to, the recoverable damages are expressly limited to the pecuniary injury suffered by those made by the statute beneficiaries of the action and of its results.

Act No. 104, Public Acts of 1909, is not an amendment of any other statute. It alters the rules of the common law with respect to a single class of employers and employés. As to all other employers and their servants, whether in like or in other circumstances, those rules re-

main unaltered. Defendant introduced testimony to prove that private railroads are operated in this State, using cars and locomotives, employing engineers, firemen, conductors, and brakemen, but transporting neither passenger nor freight for the public or for any but the owners of the roads. And it is contended that the act of the legislature in question here violates the constitutional restrictions upon legislation which have been referred to because it arbitrarily places upon common carrier railroads a burden, and makes them exceptional and disfavored creatures in law, and arbitrarily favors and relieves from disabilities the employés of such railroads; thus denying to defendant the equal protection of the laws, and abridging the rights, privileges, and immunities of common carrier railroads. It is a part of the contention in this behalf that section 4 of the act takes away from such companies the right and privilege of freely contracting with employés.

All who pursue the business of carrying passengers or goods or information, for hire, for the public generally, railroad companies, express companies, telegraph companies, telephone companies, street car companies, owners and operators of omnibuses, cabs, carriages, carts, drays, trucks, sleds, boats, are common carriers. For the purposes of the act in question, the legislature has singled out common carrier railroads. It has imposed upon them liability to employés different from that imposed by law upon other common carriers, and upon employers generally, in favor of their employés, who thus enjoy privileges which the law denies to employés of other common carriers and employés generally. That the legislation is discriminatory is plain. May it stand in the face of the prohibition against unequal laws in the Federal Constitution? That depends, *first*, upon whether the classification made by the legislature is an arbitrary or is a reasonable one, warranted by propriety or by necessity; *second*, upon whether there has been an unlawful infringement of the

right of common carrier railroads to make contracts with their servants.

It is not beyond the power of the legislature of a State to classify the subjects of its laws, and to make provisions applicable to one class of subjects which have no application to another class.   It is unnecessary for us to decide for ourselves whether the act in question offends against the Constitution of the United States, as it is contended that it does, because the Federal Supreme Court, the judgments of which upon such questions are final and binding upon the courts of the States, has determined the question adversely to appellant.   A brief review of some of the decisions of that court touching the general subject will be of service.

The Federal statute of 1906 (Act June 11, 1906, chap. 3073, 34 U. S. Stat. 232 [U. S. Comp. Stat. Supp. 1911, p. 1316]) applied to every common carrier engaged in interstate commerce, in commerce in the territories and the District of Columbia, and the first section of the act was not otherwise unlike the first section of the Michigan statute.   By a divided court it was held (Employers' Liability Cases, 207 U. S. 463 [28 Sup. Ct. 141]) that the act was unconstitutional as applied to commerce among the several States, because providing that in such service the common carrier should be liable to any of its employés.   The act was construed by the majority of the judges to mean *any employé,* whether employed in interstate or in intrastate business of the corporation.   In *El Paso, etc., R. Co.* v. *Gutierrez,* 215 U. S. 87 (30 Sup. Ct. 21), the court had before it a judgment of the supreme court of the State of Texas, which sustained the Federal act as applied to commerce in the territories.   The judgment was affirmed. The act, as applied to commerce in the District of Columbia, was sustained by the court of appeals of the District in *Hyde* v. *Railway Co.,* 31 App. (D. C.) 466, in an opinion referred to with approval by the Supreme Court of the United States.   *El Paso, etc., R. Co.* v. *Gutierrez, supra.*   In 1908 the act of Congress of 1906 was re-

pealed, and in place of it the Congress enacted a similar law approved April 22, 1908 (35 Stat. 65, chap. 149 [U. S. Comp. Stat. Supp. 1911, p. 1322]), which reads as follows:

"An act relating to the liability of common carriers by railroad to their employés in certain cases.

"Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that every common carrier by railroad while engaging in commerce between any of the several States or territories, or between any of the States and territories, or between the District of Columbia and any of the States or territories, or between the District of Columbia or any of the States or territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employé, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employé; and, if none, then of such employé's parents; and if none, then the next of kin dependent upon such employé, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employés of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

"SEC. 2. That every common carrier by railroad in the territories, the District of Columbia, the Panama Canal zone, or other possessions of the United States shall be liable in damages to any person suffering injury while he is employed by such carrier in any of said jurisdictions, or, in case of the death of such employé, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employé; and, if none, then of such employé's parents; and, if none, then of the next of kin dependent upon such employé, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employés of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

"SEC. 3. That in all actions hereafter brought against any such common carrier by railroad under or by virtue

of any of the provisions of this act to recover damages for personal injuries to an employé, or where such injuries have resulted in his death, the fact that the employé may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé. Provided that no such employé who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé.

"SEC. 4. That in any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injuries to, or the death of, any of its employés, such employé shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé.

"SEC. 5. That any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act, shall to that extent be void: Provided, that in any action brought against any such common carrier under or by virtue of any of the provisions of this act, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employé or the person entitled thereto on account of the injury or death for which said action was brought.

"SEC. 6. That no action shall be maintained under this act unless commenced within two years from the day the cause of action accrued. * * *

"SEC. 7. That the term 'common carrier' as used in this act shall include the receiver or receivers or other persons or corporations charged with the duty of the management and operation of the business of a common carrier.

"SEC. 8. That nothing in this act shall be held to limit the duty or liability of common carriers or to impair the rights of their employés under any other act or acts of congress, or to affect the prosecution of any pending proceeding or right of action under the act of congress entitled 'An act relating to liability of common carriers in

the District of Columbia and territories, and to common carriers engaged in commerce between the States and between the States and foreign nations to their employés', approved June eleventh, nineteen hundred and six."

This act was before the court in various cases referred to in the reports as *Second Employers' Liability Cases*, 223 U. S. 1 (32 Sup. Ct. 169). Those portions of the unanimous opinion of the court which discuss questions presented by the record before us are here repeated:

" We come, then, to inquire whether congress has exceeded its power in that regard by prescribing the regulations embodied in the present act. It is objected that it has (1) because the abrogation of the fellow-servant rule, the extension of the carrier's liability to cases of death, and the restriction of the defenses of contributory negligence and assumption of risk have no tendency to promote the safety of the employés or to advance the commerce in which they are engaged; (2) because the liability imposed for injuries sustained by one employé through the negligence of another, although confined to instances where the injured employé is engaged in interstate commerce, is not confined to instances where both employés are so engaged; and (3) because the act offends against the fifth amendment to the Constitution (*a*) by unwarrantably interfering with the liberty of contract, and (*b*) by arbitrarily placing all employers engaged in interstate commerce by railroad in a disfavored class and all their employés engaged in such commerce in a favored class.

" Briefly stated, the departures from the common law made by the portions of the act against which the first objection is leveled are these:  (*a*) The rule that the negligence of one employé resulting in injury to another was not to be attributed to their common employer is displaced by a rule imposing upon the employer responsibility for such an injury, as was done at common law when the injured person was not an employé; (*b*) the rule exonerating an employer from liability for injury sustained by an employé through the concurring negligence of the employer and employé is abrogated in all instances where the employer's violation of a statute enacted for the safety of his employés contributes to the injury, and in other instances is displaced by the rule of comparative negligence, whereby the exoneration is only from a proportional part

of the damages corresponding to the amount of negligence attributable to the employé; (c) the rule that an employé was deemed to assume the risk of injury, even if due to the employer's negligence, where the employé voluntarily entered or remained in the service with an actual or presumed knowledge of the conditions out of which the risk arose, is abrogated in all instances where the employer's violation of a statute enacted for the safety of his employés contributed to the injury; and (d) the rule denying a right of action for the death of one person caused by the wrongful act or neglect of another is displaced by a rule vesting such a right of action in the personal representatives of the deceased for the benefit of designated relatives.

"Of the objection to these changes it is enough to observe:

"*First.* 'A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will * * * of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.' *Munn* v. *Illinois*, 94 U. S. 113, 134; *Martin* v. *Railroad Co.*, 203 U. S. 284, 294 [27 Sup. Ct. 100, 8 Am. & Eng. Ann. Cas. 87]; *The Lottawanna*, 21 Wall. [U. S.] 558, 577; *Western Union Tel. Co.* v. *Milling Co.*, 218 U. S. 406, 417 [31 Sup. Ct. 59, 36 L. R. A. (N. S.) 220, 21 Am. & Eng. Ann. Cas. 815].

"*Second.* The natural tendency of the changes described is to impel the carriers to avoid or prevent the negligent acts and omissions which are made the bases of the rights of recovery which the statute creates and defines; and, as whatever makes for that end tends to promote the safety of the employés and to advance the commerce in which they are engaged, we entertain no doubt that in making those changes congress acted within the limits of the discretion confided to it by the Constitution. *Lottery Case*, 188 U. S. 321, 353, 355 [23 Sup. Ct. 321]; *Atlantic Coast Line R. Co.* v. *Riverside Mills*, 219 U. S. 186, 203 [31 Sup. Ct. 164, 31 L. R. A. (N. S.) 7].

"We are not unmindful that that end was being meas-

urably attained through the remedial legislation of the several States, but that legislation has been far from uniform, and it undoubtedly rested with congress to determine whether a national law, operating uniformly in all the States upon all carriers by railroad engaged in interstate commerce, would better subserve the needs of that commerce. *The Lottawanna*, 21 Wall. [U. S.] 558, 581, 582; *Baltimore & Ohio R. Co.* v. *Baugh*, 149 U. S. 368, 378, 379 [13 Sup. Ct. 914].

"The second objection proceeds upon the theory that, even although congress has power to regulate the liability of a carrier for injuries sustained by one employé through the negligence of another where all are engaged in interstate commerce, that power does not embrace instances where the negligent employé is engaged in intrastate commerce. But this is a mistaken theory, in that it treats the source of the injury, rather than its effect upon interstate commerce, as the criterion of congressional power. As was said in *Southern R. Co.* v. *United States*, 222 U. S. 20, 27 [32 Sup. Ct. 2], that power is plenary, and competently may be exerted to secure the safety of interstate transportation and of those who are employed therein, no matter what the source of the dangers which threaten it. The present act, unlike the one condemned in *Employers' Liability Cases*, 207 U. S. 463 [28 Sup. Ct. 141], deals only with the liability of a carrier engaged in interstate commerce for injuries sustained by its employés while engaged in such commerce. And, this being so, it is not a valid objection that the act embraces instances where the causal negligence is that of an employé engaged in intrastate commerce; for such negligence, when operating injuriously upon an employé engaged in interstate commerce, has the same effect upon that commerce as if the negligent employé were also engaged therein.

"Next in order is the objection that the provision in section 5, declaring void any contract, rule, regulation, or device, the purpose or intent of which is to enable a carrier to exempt itself from the liability which the act creates, is repugnant to the fifth amendment to the Constitution as an unwarranted interference with the liberty of contract. But of this it suffices to say, in view of our recent decisions in *Chicago, etc., R. Co.* v. *McGuire*, 219 U. S. 549 [31 Sup. Ct. 259], *Atlantic Coast Line Co.* v. *Riverside Mills*, 219 U. S. 186 [31 Sup. Ct. 164,

31 L. R. A. (N. S.) 7], and *Baltimore & Ohio R. Co.*
v. *Interstate Commerce Commission*, 221 U. S. 612
[31 Sup. Ct. 621], that if congress possesses the power to
impose that liability, which we here hold that it does, it
also possesses the power to insure its efficacy by prohibit-
ing any contract, rule, regulation, or devise in evasion of
it.

"Coming to the question of classification, it is true that
the liability which the act creates is imposed only on inter-
state carriers by railroad, although there are other inter-
state carriers, and is imposed for the benefit of all employés
of such carriers by railroad who are employed in interstate
commerce, although some are not subjected to the peculiar
hazards incident to the operation of trains or to hazards
that differ from those to which other employés in such
commerce not within the act are exposed. But it does
not follow that this classification is violative of the 'due
process of law' clause of the fifth amendment. Even if it
be assumed that that clause is equivalent to the 'equal
protection of the laws' clause of the fourteenth amend-
ment, which is the most that can be claimed for it here, it
does not take from congress the power to classify, nor does
it condemn exertions of that power merely because they
occasion some inequalities. On the contrary, it admits of
the exercise of a wide discretion in classifying according
to general, rather than minute, distinctions, and condemns
what is done only when it is without any reasonable basis,
and therefore is purely arbitrary. *Lindsley* v. *Gas Co.*,
220 U. S. 61, 78 [31 Sup. Ct. 337, Ann. Cas. 1912C, 160].
Tested by these standards, this classification is not objec-
tionable. Like classifications of railroad carriers and em-
ployés for like purposes, when assailed under the equal
protection clause, have been sustained by repeated decis-
ions of this court. *Missouri Pacific R. Co.* v. *Mackey*,
127 U. S. 205 [8 Sup. Ct. 1161]; *Louisville, etc., R. Co.*
v. *Melton*, 218 U. S. 36 [30 Sup. Ct. 676]; *Mobile, etc.,
R. Co.* v. *Turnipseed*, 219 U. S. 35 [31 Sup. Ct. 136, 32
L. R. A. (N. S.) 226, Ann. Cas. 1912A, 463].

"It follows that the answer to the second of the ques-
tions before stated must be that congress has not exceeded
its power by prescribing the regulations embodied in the
present act."

In *St. Louis, etc., R. Co.* v. *Conley*, 187 Fed. 949,
110 C. C. A. 97, the Federal act of 1908 was considered.

It was urged against its validity that it sought to deprive
the defendant railroad company of the liberty and privi-
lege of making contracts with its employés, and to im-
pose upon it liabilities that were unreasonable, and not
within the terms of its contracts with its employés, and
thereby to deprive it of its liberty to make contracts and
of its property without due process of law.   This conten-
tion was overruled upon the authority of *Allgeyer* v.
*Louisiana*, 165 U. S. 578 (17 Sup. Ct. 427); *Chicago,
etc., R. Co.* v. *McGuire*, 219 U. S. 549 (31 Sup. Ct. 259),
and other cases, the court saying:

"The primary object of the act was to promote the
safety of employés of railroads while actively engaged in
the movement of interstate commerce, and is well calcu-
lated to subserve the interests of such commerce by af-
fording such protection; there being, as it seems to us, a
substantial connection between the object sought to be
attained by the act and the means provided to accomplish
that object."

By way of illustration it is said:

"Thus, if congress may require the use of safety appli-
ances, it may prohibit agreements to dispense with them.
If it may restrict employment in any service to eight
hours a day, it may make contracts for longer service un-
lawful.   The rule is, where the regulation is valid—that
is, not being arbitrary or unrelated to a proper purpose—
congress may prevent it from being nullified by prohibi-
tive contracts.   In all such cases of interference with the
right to contract, it has been held to be 'incidental to the
main object of the regulation, and, if the power exists to
accomplish the latter, the interference is justified as an
aid to its exercise'"—citing *Holden* v. *Hardy*, 169 U. S.
366 (18 Sup. Ct. 383).

The fourteenth amendment to the Federal Constitution
is addressed to the States, and not to the Congress.   The
foregoing cases are not authority precisely sustaining the
validity of the act in question, although the reasoning in-
dulged is appropriate to the precise questions presented
here.   But the precise questions here involved have been

determined by the same court in favor of the validity of the legislation.

In *Mobile, etc., R. Co.* v. *Turnipseed*, 219 U. S. 35 (31 Sup. Ct. 136, 32 L. R. A. [N. S.] 226, Ann. Cas. 1912A, 463), there was involved a statute of the State of Mississippi and a portion of the constitution of that State, and it was claimed that, as construed by the supreme court of Mississippi, the statute (section 3559 of the Code) violated the fourteenth amendment, because it denied to railroad corporations the equal protection of the laws. The statute, following the constitution of the State, abrogated the common-law fellow-servant rule as to every employé of a railroad corporation. It was urged that this legislation, applicable only to employés of a railroad company, was arbitrary, and in denial of equal protection of law, unless limited in its effect to employés imperiled by the hazardous business of operating railroad trains or engines, and that the Mississippi supreme court had in prior cases so defined and construed the legislation. *Ballard* v. *Oil Co.*, 81 Miss. 507 (34 South. 533, 62 L. R. A. 407, 95 Am. St. Rep. 476); *Bradford Construction Co.* v. *Heflin*, 88 Miss. 314 (42 South. 174, 12 L. R. A. [N. S.] 1040, 8 Am. & Eng. Ann. Cas. 1077). It was contended that the provision had been construed in the case at bar as applicable to an employé not subject to any danger or peril peculiar to the operation of railway trains and that, therefore, the reason for the classification failed and the provision so construed and applied was a denial of the equal protection of the law. The action was tort for the wrongful killing of a section foreman in the service of the railway company, and he had a judgment which was affirmed by the supreme court of the State. Of this contention the court, by Mr. Justice Lurton, said:

" This contention, shortly stated, comes to this, that, although a classification of railway employes may be justified from general considerations based upon the hazardous character of the occupation, such classification be-

comes arbitrary, and a denial of the equal protection of the law the moment it is found to embrace employés not exposed to hazards peculiar to railway operation.

"But this court has never so construed the limitation imposed by the fourteenth amendment upon the power of the State to legislate with reference to particular employments as to render ineffectual a general classification resting upon obvious principles of public policy, because it may happen that the classification includes persons not subject to a uniform degree of danger. The insistence, therefore, that legislation in respect of railway employés generally is repugnant to the clause of the Constitution guaranteeing the equal protection of the law merely because it is not limited to those engaged in the actual operation of trains, is without merit."

The opinion refers with approval to *Louisville, etc., R. Co.* v. *Melton*, 218 U. S. 36 (30 Sup. Ct. 676). In that case the injured person was a carpenter in the employ of the railroad company, and was engaged usually at bridge carpentering. When injured, he was constructing the foundation of a coal tipple at which engines might coal. A timber intended to be a part of the foundation of the tipple was being raised by a block and tackle, and Melton, with the foreman, and under his orders, was standing under the timber and engaged in placing props under it to prevent its lowering when the strain upon the rope passing through the pulley was relaxed. A link of the chain which held the pulley broke, the timber fell, Melton underneath it, inflicting serious injury. The chain which broke was furnished by the foreman, and had been put in position under his direction. Melton was a resident of Kentucky, but the injury occurred in Indiana. He began his action in Kentucky. The employer's liability act of Indiana provides that:

"Every railroad * * * operating in this State shall be liable in damages for personal injury suffered by any employé while in its service, the employé so injured being in the exercise of due care and diligence, in the following cases:

"*First.* When such injury is suffered by reason of any

defect in the condition of ways, works, plants, tools and machinery connected with or in use in the business of such corporation, when such defect was the result of negligence on the part of the corporation, or some person entrusted by it with the duty of keeping such ways, works, plant, tools or machinery in proper condition.

"*Second.* Where such injury resulted from the negligence of any person in service of such corporation, to whose order or direction the injured employé at the time of the injury was bound to conform, and did conform." Laws 1893, chap. 130.

One question raised in the court below was that the statute, in so far as it was made to apply to the facts in the case, was a violation of the equal protection clause of the fourteenth amendment. Of this it was said:

"That the fourteenth amendment was not intended to, and does not, strip the States of the power to exert their lawful police authority is settled, and requires no reference to authorities. And it is equally settled—as we shall hereafter take occasion to show—as the essential result of the elementary doctrine that the equal protection of the law clause does not restrain the normal exercise of governmental power, but only abuse in the exertion of such authority; therefore that clause is not offended against simply because as the result of the exercise of the power to classify some inequality may be occasioned. That is to say, as the power to classify is not taken away by the operation of the equal protection of the law clause, a wide scope of legislative discretion may be exerted in classifying without conflicting with the constitutional prohibition.

"It is beyond doubt foreclosed that the Indiana statute does not offend against the equal protection clause of the fourteenth amendment, because it subjects railroad employés to a different rule as to the doctrine of fellow-servant from that which prevails as to other employments in that State. *Tullis* v. *Railroad Co.*, 175 U. S. 348 [20 Sup. Ct. 136]; *Pittsburg, etc., R. Co.* v. *Ross*, 212 U. S. 560 [29 Sup. Ct. 688]. But while conceding this, the argument is that classification of railroad employés for the purpose of the doctrine of fellow-servant can only consistently with equality and uniformity embrace such employés when exposed to dangers peculiarly resulting from the operation of a railroad, thus affording ground for dis-

tinguishing them for the purpose of classification from co-employés not subject to like hazards or employés engaged in other occupations.   The argument is thus stated:

" ' Plaintiff in error does not question the right of the legislature of Indiana to classify railroads in order to impose liability upon them for injuries to their employés incident to railroad hazards, but it does insist that, to make this a constitutional exercise of legislative power, the liability of the railroads must be made to depend upon the character of the employment and not upon the character of the employer.'

"Thus stated, the argument tends to confuse the question for decision, since there is no contention that the statute as construed bases any classification upon some supposed distinction in the person of the employer.   The idea evidently intended to be expressed by the argument is that although, speaking in a general sense, it be true that the hazards arising from the operation of railroads are such that a classification of railroad employés is justified, yet as in operating railroads some employés are subject to risks peculiar to such operation and others to risks, which, however serious they may be, are not in the proper sense risks arising from the fact that the employés are engaged in railroad work, the legislative authority in classifying may not confound the two by considering in a generic sense the nature and character of the work performed by railroad employés collectively considered, but must consider and separately provide for the distinctions occasioned by the varying nature and character of the duties which railroad operatives may be called upon to discharge. In other words, reduced to its ultimate analysis, the contention comes to this:   That by the operation of the equal protection clause of the fourteenth amendment the States are prohibited from exerting their legitimate police powers upon grounds of the generic distinction obtaining between persons and things, however apparent such distinction may be, but, on the contrary, must legislate upon the basis of a minute consideration of the distinctions which may arise from accidental circumstances as to the persons and things coming within the general class provided for. When the proposition is thus accurately fixed, it necessarily results that in effect it denies the existence of the power to classify, and hence must rest upon the assumption that the equal protection clause of the fourteenth amendment has a scope and effect upon the lawful author-

ity of the States contrary to the doctrine maintained by this court without deviation.   This follows since the necessary consequence of the argument is to virtually challenge the legislative power to classify and the numerous decisions upholding that authority.   To this destructive end it is apparent the argument must come, since it assumes that, however completely a classification may be justified by general considerations, such classification may not be made if inequalities be detected as to some persons embraced within the general class by a critical analysis of the relation of the persons or things otherwise embraced within the general class.   A brief reference to some of the cases dealing with the power of a State to classify will make the error of the contention apparent.

"In *Magoun* v. *Savings Bank,* 170 U. S. 294, 296 [18 Sup. Ct. 594], while declaring that the power of a State to distinguish, select, and classify objects of legislation was of course not without limitation, it was said:

" 'Necessarily this power must have a wide range of discretion.'

"After referring to various decisions of this court, it was observed:

" ' There is therefore no precise application of the rule of reasonableness of classification, and the rule of equality permits many practical inequalities.   And necessarily so.   In a classification for governmental purposes there cannot be an exact exclusion or inclusion of persons and things.'

"Again considering the subject in *Orient Ins. Co.* v. *Daggs,* 172 U. S. 557 [19 Sup. Ct. 281], it was reiterated that the legislature of a State has necessarily a wide range of discretion in distinguishing, selecting, and classifying, and it was declared that it was sufficient to satisfy the demand of the Constitution if a classification was practical and not palpably arbitrary.

"In *Minnesota Iron Co.* v. *Kline,* 199 U. S. 593 [26 Sup. Ct. 159], a statute of Minnesota, providing that the liability of railroad companies for damages to employés should not be diminished by reason of accident occurring through the negligence of fellow-servants, was held not to discriminate against any class of railroads, or to deny the equal protection of the laws because of a proviso which excepted employés engaged in construction of new and unopened railroads.   In the course of the opinion, the court said (199 U. S. 598 [26 Sup. Ct. 161]):

" ' The whole case is put on the proviso, and the argument with regard to that is merely one of the many attempts to impart an overmathematical nicety to the prohibitions of the fourteenth amendment.'

" These principles were again applied in *Martin* v. *Railroad Co.*, 203 U. S. 284 [27 Sup. Ct. 100, 8 Am. & Eng. Ann. Cas. 87], and the doctrines were also fully considered and reiterated at this term in *Southwestern Oil Co.* v. *Texas*, 217 U. S. 114 [30 Sup. Ct. 496].

" And, coming to consider the concrete application made of these general principles in the decisions of this court which have construed the statute here in question, and statutes of the same general character enacted in States other than Indiana, we think when rightly analyzed it will appear that they are decisive against the contention now made. It is true that in the *Tullis Case*, which came here on certificate, the nature and character of the work of the railroad employé who was injured was not stated, and that reference in the course of the opinion was made to some State cases, limiting the right to classify to employés engaged in the movement of trains. But that it was not the intention of the court to thereby intimate that a classification if not so restricted would be repugnant to the equal protection clause of the fourteenth amendment will be made clear by observing that the previous case of *Chicago, etc., R. Co.* v. *Pontius*, 157 U. S. 209 [15 Sup. Ct. 585], was cited approvingly, in which, under a statute of Kansas classifying railroad employés, recovery was allowed to a bridge carpenter employed by the railroad company, who was injured while attempting to load timber on a car. And in the opinion in the *Pontius Case* there was approvingly cited a decision of the court of appeals of the eighth circuit (*Chicago, etc., R. Co.* v. *Stahley*, 62 Fed. 363 [11 C. C. A. 88]), wherein it was held that under the same statute an employé injured in a roundhouse while engaged in lifting a driving rod for attachment to a new engine could recover by virtue of the statute. All this is made plainer by the ruling in *St. Louis, etc., R. Co.* v. *Callahan*, 194 U. S. 628 [24 Sup. Ct. 857], where, upon the authority of the *Tullis Case*, the court affirmed a judgment of the supreme court of Missouri, which held that recovery might be had by a section hand upon a railroad who, while engaged in warning passers-by in a street beneath an overhead bridge, was struck by a tie thrown from the structure.

"While, as we have previously said, it is true there are State decisions dealing with statutes classifying railroad employés sustaining the restricted power to classify which is here insisted upon, we do not think it is necessary to review them or to notice those tending to the contrary. They are referred to in the opinions rendered in the court below. Nor do we think our duty in this respect is enlarged because since the judgment below was rendered the court of last resort in Indiana (*Indianapolis, etc., Terminal Co.* v. *Kinney,* 171 Ind. 612 [85 N. E. 954, 23 L. R. A. (N. S.) 711], and *Cleveland, etc., R. Co.* v. *Foland* [174 Ind. 411, 91 N. E. 594, 92 N. E. 165], decided April 20, 1910) has, upon the theory that it was necessary to save the statute in question from being declared repugnant to the equality clause of the State constitution and the fourteenth amendment, unequivocally held that the statute must be construed as restricted to employés engaged in train service."

We have examined the opinion of the circuit court of appeals in *Chicago, etc., R. Co.* v. *Westby,* 178 Fed. 619, 102 C. C. A. 65, relied upon by appellant, in which is considered the employer's liability act of South Dakota, which provides:

"Section 1. That every common carrier engaged in trade or commerce in the State of South Dakota shall be liable to any of its employés, or in the case of his death, to his personal representative for the benefit of his widow and children, if any, if none, then for his parents, if none, then for his next of kin dependent upon him, for all damages which may result from the negligence of any of its officers, agents or employés, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways or works." Laws 1907, chap. 219.

The court concludes that the statute of Dakota is unconstitutional, cannot be construed so as to make it constitutional, or the unconstitutional part eliminated by striking out or disregarding any words or clauses of the act, but only by introducing into the statute words of limitation expressly restricting the general terms "every common carrier" and "any employé" to common car-

riers using dangerous power and machinery and their employés engaged in dangerous occupations about them. Such a limitation, it is said, would exclude from the operation of the act far the larger number of employers within its terms and probably a majority of the employés within its terms. The effect of the decision is to hold that there is disclosed no such reasonable ground for difference between those within and those without the class formed by the statute as bears any just or proper relation to the classification attempted by it, and that it cannot be sustained.

It will be noted that the statute of South Dakota applies to every common carrier and to all employés of common carriers, as did the Federal act of 1906, while the Michigan statute applies to a single class of common carriers, namely, railroads. Much that is said in argument, in the opinion in the *Westby Case*, in condemnation of the South Dakota law, sustains the classification made in the Michigan law. The legislation of the various States is not uniform and has been generally attacked as offending the fourteenth amendment to the Federal Constitution in the classification attempted. In some of the States, notably the States of Iowa and Indiana, the courts met these attacks by a construction of the law. As, for example, in *Indianapolis, etc., Terminal Co.* v. *Kinney*, 171 Ind. 612, 617 (85 N. E. 954, 956 (23 L. R. A. [N. S.] 711]), it was said:

"Notwithstanding the language of the statute is ' that every railroad or other corporation, except municipal, operating in this State, shall be liable for damages for personal injury suffered by any employé while in its service,' it must not for a moment be understood that the benefits of the statute are extended to all employés of a railroad corporation, or to any other class of employés than those whose duties expose them to the peculiar hazards incident to the use and operation of railroads. There is no reason in fact or fancy why the benefits of the statute should be extended to the office and shop employés of railroad corporations, or to others removed from the dan-

gers of train service, and denied to the multitude of other workmen engaged in businesses of like and equal hazard."

In Wisconsin the validity of an act of similar import affecting "every railroad company" was sustained by a divided court in *Kiley* v. *Railway Co.*, 138 Wis. 215 (119 N. W. 309, 120 N. W. 756). The Michigan statute excepts employés working in shops and offices. It includes in its terms all other employés of every common carrier railroad. The language employed is not ambiguous, and we find no occasion to give it by construction a meaning different from that expressed in its plain terms. It applies to all common carrier railroads and to all employés of such railroads except those working in shops and offices. Other railroads and the employés of them are not within its terms. Nevertheless, upon principle, the classification which is made is not clearly arbitrary and the act does not offend against the Constitution of the United States or the Constitution of this State.

This is true, also, with respect to the provisions of section 4 of the act which are claimed to abridge the right to freely enter into contracts. This is demonstrated by authority already presented, in addition to which reference is made to *Chicago, etc., R. Co.* v. *McGuire*, 219 U. S. 549 (31 Sup. Ct. 259). Whether section 4 of the act can be held to relate to contracts made after an injury is received is not a question now presented for decision. It is contended, as we understand the brief, that plaintiff was negligent in the same degree that his fellow-servants were negligent; that in such a case the court should determine, as matter of law, that plaintiff cannot recover. The argument involves, to some extent, the construction of that portion of section 2 of the act found in the first proviso:

"That the negligence of such employé was of a lesser degree than the negligence of such company, its officers, agents, or employés."

The act must be construed, if it is possible to do so, so

as to give effect to the legislative intention. And this intention must be found in the act itself and in the conditions which it is assumed the legislature sought to remedy. Nothing in the act indicates a purpose to interfere with the exercise of the judicial power, as it existed when the Constitution was adopted, a purpose wholly beyond the legislative power. But the intention to modify—alter—certain rules of the common law, uniformly applied and enforced by the courts, is evident, and this the legislature undoubtedly may do.

The term "negligence" is employed in the act. Actionable negligence is absence of ordinary care, and ordinary care is the care exercised by the great mass of mankind. If conduct does not measure up to this standard, it is negligent, whether it falls much or little below the standard. The act does not permit every employé of a railroad company injured in its service to recover damages for the injury. There must be actionable negligence, attributable to the company and causing, or contributing, to the injury, or there can be no recovery.

The courts now, as formerly, have the power, and it is their duty, to determine whether there is evidence tending to prove actionable negligence attributable to the company. Courts have the power, and it is equally their duty to determine whether there is testimony tending to prove the mutual fault of the injured person and the company, and that the fault of each was in proximate relation to the injury. It may, indeed, be the duty of the court to determine that, while the fault was mutual, the fault of one of the parties was clearly greater than that of the other. As applied to this statute, we are of opinion that the terms slight, ordinary, and gross negligence, sometimes employed in opinions of courts and by authors of legal treatises, afford no proper basis for reaching the required determination. The question in all cases of mutual fault will be "whether the fault of the defendant was the greater." See *Jensen* v. *Railway Co.*, 145 Wis. 326 (128 N. W. 982).

The court submitted to the jury this question of greater fault, although in terms of negligence. This, in our opinion, was required by the testimony produced. It is possible, and is suggested, that less confusion is likely to result in cases arising under the statute if the jury be instructed in terms of care or of fault rather than those of degrees of negligence. The testimony showed that plaintiff was an extra, not a regular, brakeman at the time he was injured, and his antecedent earnings had been some $38 a month. He had worked but 16 days in October, and 13 days in November. A witness produced a computation showing the present worth of an annual earning of $800 per year, with an expectancy of 40 years. The total was $17,854.59. On cross-examination, the witness stated that he added the earnings of plaintiff for October and November for 29 days, assumed there were 26 working days in a month, and with these factors produced an annual earning of more than $800. Witness had also made a computation based upon an earning of $300 annually, the result of which was $6,492.58. On a motion being made to strike out the testimony there was an extended colloquy of court and counsel, during which the court said:

"The plaintiff doesn't claim, and there is no proof he will claim, 26 days. They simply claim this: That, if the plaintiff worked 26 days, he should be able to earn $800, which amounts to a certain specific sum. If he should earn $300, it would amount to a certain less sum, under the value for that period."

And the court held there was testimony upon the subject, and then specially instructed the jury as follows:

"The court will charge you, gentlemen of the jury, that this plaintiff is entitled to recover, if at all, the present value of his future prospective earnings; that his expectancy of life is 40.85 years. We have figured 40 years, so as to make it an even number. That means that according to the life table, which is made a part of the case when there is a permanent injury, in order to guide the jury as to the average length of life that a man 23 years of age will live—the court allows this table to be intro-

duced. That means that the average man, or the average number of men, at 23 years of age will live 40 years. That does not mean that Mr. Sonsmith will ultimately live that long. He is chargeable with all the vicissitudes of life. He may live longer than the expectation of life, or he may not live that long. But this is simply a guide for you in fixing the probable time that he may live, and then, in connection with that, fixing the probable loss. * * * Now we have said that working 26 days a month, as men ordinarily do as brakemen, at the wages that he did earn, he would earn $825 in one year. Now, we don't need to say to you, gentlemen of the jury, that you are to accept that as final. You may do it. You may reduce it. That is simply a matter for you to consider. But Mr. Sonsmith is entitled to first, what is stated there, loss of earnings from date of injury to date of trial, whatever sum in your sound judgment and discretion he is entitled to."

In the general charge care was taken in the instructions concerning the measure of recoverable damages, and the court again said to the jury:

"All these matters are to be borne in mind by you. There has been testimony introduced here, gentlemen of the jury, concerning the wages this man would earn, testimony as to what he actually earned, and as to what he was capable of earning. In taking that into consideration I wish to say to you that the testimony that has been introduced here is upon a certain theory of employment, from the actual and entire time and the fractions of time and is simply introduced here to aid you in coming to a conclusion, should you determine that there is a liability and that the plaintiff shall have his recompense; and that the evidence introduced here as to what the plaintiff worked for the Pere Marquette, that was put in upon the basis of full time of all secular days, and is nothing that should impress you other than as a simple method in determining in a regular fair ratio what you think he would actually be employed by the defendant. These matters are all to be taken and considered by you as an entirety in coming to this conclusion. All these matters are to be borne in mind by you. The 40.85 years' expectancy is the average duration of life of a normally well man of his age; but, of course, does not absolutely show how long he

will live.   It is only evidence tending to show how long a man of his age and in good average health will live; and you are not bound fixedly or absolutely by it, but must determine as best you can, if you find it necessary, what will be the probability of his life.   All these matters you will very carefully consider."

Mere speculative computations ought not to be received in cases of this nature, but we think the computation was not wholly speculative.   There was some basis for it, and the court fairly advised the jury concerning its value and of their duty.

We do not find in the other exceptions any abuse of the discretion of the court, and, upon the whole record, are of opinion that the judgment must be, and it therefore is, affirmed.

MOORE, C. J., and STEERE, BROOKE, and STONE, JJ., concurred.